**In the Matter of Paul C. WILDMAN, et al., Debtor.**

**Bankruptcy No. 81 B 5869.**

United States Bankruptcy Court, N.D. Illinois, E.D.

May 6, 1983.

James Chatz, Lord, Bissell & Brook, Joel Carlins, Chicago, Ill., for debtor.

Professor Robert E. Ginsberg, trustee.

Melanie Rovner Cohen, Chicago, Ill., for trustee.

Robert Motel, Motel & Kreisman, Chicago, Ill., for limited partners.

Louis W. Levit, Levit & Miller, Chicago, Ill., for Equity Sec. Holders Committee.

## MEMORANDUM OPINION

RICHARD L. MERRICK, Bankruptcy Judge.

There presently are pending before this Court fourteen motions to dismiss bankruptcy cases and bankruptcy proceedings on the ground that this Court does not have jurisdiction to act, under the principles enunciated in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), (hereinafter referred to as the *Northern Pipeline* case.) [1] All of the motions concern the validity of a rule adopted December 20, 1982 by the District Court of the Northern District of Illinois,[2] pursuant to a directive

---

1. This was a construction of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549, passed November 6, 1978, effective October 1, 1979, referred to herein as the "Reform Act."

2. The order of the Judicial Council of the Seventh Circuit and the order of the Northern District of Illinois are attached as Appendix I.

of the Circuit Council for the Seventh Circuit, issued December 23, 1982, following a memorandum of the Director of the Administrative Office of the United States, dated December 3, 1982, directed to federal judges and clerks and enclosing a model rule and sample order. The variations between the rule adopted in this district, the rules adopted in other districts, and the two model rules distributed by the Administrative Office, respectively September 27, 1982 and December 3, 1982, are not of sufficient importance to the issues to be decided here to justify comparison. Similarly, in decisions of case precedents involving the rule no attempt will be made to distinguish the differences, which are peripheral and do not affect the central core issues.

The captioned proceeding arose in a voluntary Chapter 11 reorganization of an individual who is a general partner in a number of limited partnerships, many of which also have filed voluntary Chapter 11 cases. There is a common trustee at the present time for all of the cases, in spite of a theoretical conflict of interest, because the books and records of all of the debtors are in such a state of disarray that it would have been impossible to determine the debtor-creditor relationships among them until meaningful records had been reconstructed. (It would have been possible to have had 15 trustees from the outset, provided that they all had retained the same accountant and had been willing to have permitted one of their number to be the lead trustee in establishing priorities respecting the order in which administration problems would have been addressed, but the expenses of administration would have been astronomical). The principal asset of each limited partnership is an apartment building located on the Near North Side in Chicago. The principal asset of each general partnership is the general partners' interest in the limited partnerships.

The motion to dismiss on jurisdictional grounds was filed by a committee of the limited partners, which also has objected to the sale of the apartment building, to the payment of accountant's fees, to the payment of attorneys' fees, and to the payment of real estate broker's commissions. Some interim attorneys' fees and accountant's fees have been authorized by the Court to the extent of 50% of the amount requested, with the balance to be considered near the termination of the case. Those motions are being held in abeyance until after the jurisdictional motion to dismiss has been determined.

## BACKGROUND

Probably the greatest problem presented to the Anglo-American bankruptcy practice throughout its 440 year history has been the absence of a broad and clearly defined jurisdiction. At the outset the bankruptcy commissioners had jurisdiction only over assets which they could bring into their possession. This broadened to the point where assets in the actual or constructive possession of the bankrupt were deemed to be in *custodia legis*. As bankruptcy courts, the district courts had only a summary jurisdiction. Innumerable appellate decisions turn on the issue of summary jurisdiction and plenary jurisdiction,[3] decisions which had to become final as a preliminary to the problem of administering the bankrupt estate. Delays of several years might take place with the attendant large attorneys' fees over the question of whether a corporate reorganization properly was before a referee in a Chapter XI case or before a district

**3.** "The issue of the jurisdiction of the bankruptcy court has been litigated in every volume of the Federal Reporter.... In an area of law in which time is of the essence, the delay attendant upon litigation over jurisdiction is needless and expensive." H.Rep. No. 595, 95th Cong., 1st Sess. 43 (1977) U.S.Code Cong. & Admin. News 1978, pp. 5787, 6004 (footnotes omitted). The following cases illustrate the delay inherent in litigating the jurisdictional issue: *Burnham et al v. Todd*, 139 F.2d 338 (5th Cir.1943) (10 years), *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (6 years), *May (Bankruptcy of George W. Cowen Co. Inc.) v. Henderson*, 268 U.S. 111, 45 S.Ct. 456, 69 L.Ed. 870 (1925) (5 years), *First National Bank of Mobile v. Bailes*, (In the Matter of American Southern Publishing Company), 426 F.2d 160 (5th Cir.1970) (4 years).

court in a Chapter X case. Frequently the delay in reaching that conclusion caused all hopes for rehabilitation to vanish, and the only question which remained was what court would oversee the liquidation. Much of the ten years preceding the final passage of the Bankruptcy Reform Act of 1978[4] was devoted to hearings on the issue. of court structure and jurisdiction.

During the middle 1970's as bankruptcy reform was being considered in Congress, one of the principal improvements sought was to eliminate the delays and expense which were the inevitable consequence of a divided jurisdiction over both bankruptcy cases and proceedings arising in or related to bankruptcy cases. There was a considerable concern that giving broad authority to Article I judges might create a constitutional problem, and H.R. 8200, which is the skeleton of both the Bankruptcy Code and the bankruptcy amendments to the Judicial Code, provided for an Article III bankruptcy court. The Senate Bill (S. 2266) provided for an Article I bankruptcy court, but in the Conference Committee at the end of the 95th Congress both houses agreed to an

Article III court. The House approved the conference report, and it was on the consent calendar of the Senate when the Chief Justice called several Senators on the telephone, including Senator Strom Thurmond of South Carolina. That conversation has not been published, but as a consequence of it, Senator Thurmond placed a hold on the bill which was not released until § 1471 was modified to provide for a two-tiered court structure in which the district court had original and exclusive jurisdiction over all bankruptcy cases (§ 1471(a)) and also original but not exclusive jurisdiction over all proceedings arising in or related to bankruptcy cases (§ 1471(b)).[5] The jurisdiction granted to the district courts was to be exercised by the bankruptcy courts (§ 1471(c)). It was the exercise of Article III power by Article I Courts which the Supreme Court found unconstitutional in *Northern Pipeline.*

The Supreme Court granted a three month stay of judgment (June 28, 1982—October 4, 1982) to permit the Congress to correct the jurisdictional problem either by

---

4. Pub.L. No. 95–598, 92 Stat. 2549, 11 U.S.C. §§ 101–151326 (Supp. IV 1980).

5. The amendments were limited almost exclusively to downgrading bankruptcy judges and, contrary to the statement in many district court opinions, did not alter §§ 404 and 405, except as technical requirements to conform dates to the new transition period. The principal changes were:

(a) § 1471(a) and (b) were changed by substituting "district courts" for "bankruptcy courts"; (28 U.S.C. § 1471(a) and (b);

(b) § 1471(c) was added to transfer the exercise of the § 1471(a) and (b) jurisdiction to bankruptcy courts; (28 U.S.C. § 1471(c);

(c) 1471(e) was added to give bankruptcy courts exclusive jurisdiction over all property of the debtor (28 U.S.C. § 1471(e);

(d) § 153(a) was amended to eliminate good behavior and establish a 14 year term. This change also eliminated pensions for retired bankruptcy judges for service after April 1, 1984. (28 U.S.C. § 153(a));

(e) § 407(b) was changed from a requirement to a recommendation that one third of the members of any committee of the Judicial Conference relating to bankruptcy administration and one member of a committee relating to court administration be bankruptcy judges (Bankr.Code § 407(b));

(f) § 407(c) was changed from requiring that all bankruptcy judges be invited to the annual circuit judicial conference to a minimum of one per district (Bankr.Code § 407(c)); (there is not, and never was, a requirement that bankruptcy judges and their wives be invited to the circuit banquet and dance at the conclusion of the conference; practices on this vary from circuit to circuit and, from time to time, within circuits).

(g) § 407(d) was deleted and § 621(a)(2) amended, thus reducing the requirement that two bankruptcy judges serve on the Board of the Judicial Center to one (28 U.S.C. § 621(a)(2));

(h) § 405(a)(1) imposed limitations upon a bankruptcy judge's ability to issue injunctions and cite for contempt.

(i) § 331 was amended by removing bankruptcy judges from membership on the Judicial Conference;

(j) § 293 was amended to preclude the assignment of a bankruptcy judge to sit temporarily on a court of appeals or district court;

(k) § 610 was amended by deleting bankruptcy courts from the definition of courts;

(*l*) § 456 was amended by deleting bankruptcy court as a court of which the official duty station was the District of Columbia.

increasing the stature of the bankruptcy court to an Article III plane or by reducing the level of authority to that appropriate to an Article I court. When Congressional action had not been completed by October 4, the Court granted another three month stay which expired December 24, 1982, without a law having been enacted.

An interim rule was devised by the Judicial Conference as a contingency measure to provide bankruptcy continuity in the event that Congress did not act by December 24. The rule was adopted by the circuit councils of all of the circuits and by all of the district courts within three or four days of December 24. The validity of that rule is the subject of this opinion.

## BANKRUPTCY COURT JURISDICTION

The essential issue raised by the respective motions to dismiss filed in the cases and proceedings under consideration is whether this Court has jurisdiction to hear the matter. Surface refinements cause the precise question of each individual motion to dismiss to differ somewhat as to whether it is:

(a) jurisdiction to hear a bankruptcy case,

(b) jurisdiction to hear a proceeding arising from a bankruptcy case, or

(c) jurisdiction to hear a proceeding relating to a bankruptcy case.

Because the underlying core issue is the same under all circumstances, that core issue will be answered first. It happens in the view of the law adopted by this Court, as will be explained more fully later, that the result is the same under all circumstances, although that need not have been the result if the Court had taken a narrower view of the infirmities of the interim rule.

Due to loose usage of terminology for the last century, the question of bankruptcy court jurisdiction before the enactment of the Bankruptcy Code has been obscured in the decisions and in the treatises and law review articles. So that there can be no doubt as to the meaning of this opinion, a short review of bankruptcy court jurisdiction in the past will precede a discussion of current controlling factors.

In England, there was no statutory court legislation affecting bankruptcy and insolvency jurisdiction until after American independence. The Court for Relief of Insolvent Debtors was established in 1820.[6] Originally insolvency petitions had been heard by Royal Commissions without clear lines of authority. After 1649 statutory guidelines were established for administration by commissioners or in Chancery. The Court in Bankruptcy was established in 1831.[7] Originally bankruptcy commissioners had gone to whatever court they felt might provide them with the most prompt relief. After 1600 most bankruptcy cases and proceedings were heard in Chancery.

In the United States, under every bankruptcy act, the authority of the adjudicative body always has been delineated in the enabling statute. As in England, the nature of the assets determined the nature of the jurisdiction. Until the nineteenth century wealth ordinarily was held in the form of gold, silver, land, goods, or commodities, all tangibles. A bankruptcy action was an involuntary proceeding (until 1841) in which a bankruptcy commissioner on behalf of creditors who had filed claims would collect and liquidate the tangible assets of the debtor and distribute the net proceeds among the claimants. Under the Bankruptcy Act of 1800,[8] for example, the district court or commissioners were given jurisdiction over the property in possession of the debtor, which was deemed to be *in custodia legis.* This was an *in rem* jurisdiction.

The exclusive jurisdiction which bankruptcy courts traditionally have had over property within their control has a double heritage. As a matter of common law it

---

**6.** An Act for the Relief of Insolvent Debtors in England, 1 Geo. 4, ch. 119 (1820).

**7.** An Act to Establish a Court in Bankruptcy, 1 and 2 Will. 4, ch. 56 (1831).

**8.** An Act to Establish a Uniform System of Bankruptcy Throughout the United States, passed April 4, 1800, 2 Stat. 19; repealed December 19, 1803, 2 Stat. 248.

has been established for centuries that the first court to obtain possession of a res maintains exclusive possession of it thereafter,[9] even though in *in personam* proceedings two courts of concurrent jurisdiction may continue to hear the case until a judgment is obtained in one. During the early days in English bankruptcy there frequently was a race to the courthouse between the bankruptcy commissioners and creditors who chose not to file claims, each hoping to be the first to obtain possession of the res. Usually the commissioners proceeded in Chancery, and the competing creditors would bring a detinue action in the Court of Common Pleas.

In the United States the situation has been different because the bankruptcy power is one of the express powers of Congress,[10] and under the supremacy clause the federal power supersedes that of the states.[11] Thus, as a result of the Constitution the bankruptcy courts have had exclusive jurisdiction over every res whether or not the bankruptcy court was the first to obtain possession of the res.[12] The Bankruptcy Code gave to the bankruptcy court full jurisdiction *in rem* and also full jurisdiction *in personam* with respect to bankruptcy cases and to proceedings arising from or related to bankruptcy cases.

Going back into history, trials which have followed common law procedure have been called plenary process and trials which have not have been called summary process. Frequently the difference between the two was the absence of jury trials in summary process. A trial in Chancery was not subject to a jury determination and thus was summary process. A hearing before a tribunal which was not a court similarly was summary process.

A slightly different and more common usage of "summary process" was as a generic term to describe motions, petitions, applications, and objections as contrasted with the more formal complaint and answer process. The simpler process generally was used by commissioners, registers, or referees (depending upon which of the bankruptcy acts was in force), and was called summary process. The formal procedure was used in the district courts, and was called plenary process.

Just as there were two slightly different meanings of summary process current at the same time, so also there were two variations of "summary jurisdiction." The first placed the emphasis upon the limited nature of the jurisdiction of the court of bankruptcy,[13] that essentially it was an *in rem* jurisdiction with *in personam* authority granted only in actions by trustees and receivers under §§ 60b, 67a(4) and 70e(3). The second placed the emphasis on the federal nature of the jurisdiction of the courts of bankruptcy, that they were limited to bankruptcy law and other federal questions, and were excluded from state law questions. In footnote 31[14] of the plurality opinion in *Northern Pipeline* it is noted that the question of whether a state law issue could be heard by bankruptcy referees with the consent of the parties (Bankruptcy Act § 2a(7)) never had been addressed as a constitutional problem.[15]

---

**9.** *Princess Lida of Thurn and Taxis v. Thompson,* 305 U.S. 456, 466, 59 S.Ct. 275, 280, 83 L.Ed. 285 (1939); *Penn General Casualty Co. v. Pennsylvania,* 294 U.S. 189, 195, 55 S.Ct. 386, 389, 79 L.Ed. 850 (1935); *Freeman v. Howe,* 65 U.S. (24 How.) 450, 457, 16 L.Ed. 749 (1860).

**10.** The United States Constitution, Article I, § 8, clause 4 states that "[t]he Congress shall have Power ... To establish uniform Laws on the subject of Bankruptcies throughout the United States."

**11.** The United States Constitution, Article VI, paragraph 2 states that "[t]his constitution, and the Laws of the United States which shall be

made in Pursuance thereof ... shall be the supreme Law of the Land ... "

**12.** *White v. Schloerb,* 178 U.S. 542, 546, 20 S.Ct. 1007, 1008, 44 L.Ed. 1183 (1900).

**13.** *Thompson v. Magnolia Petroleum Co.,* 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940).

**14.** 102 S.Ct. 2858, 2876.

**15.** 11 U.S.C. § 11(a)(7) (repealed by Pub.L. 95–598, title IV, § 401(a), Nov. 6, 1978, 92 Stat. 2682), states:

"... and where in a controversy arising in a proceeding under this Act an adverse party

That section (Bankruptcy Act § 2a(7)) has been misunderstood and referred to as "consent jurisdiction" or "ambush jurisdiction", but it is not proper to suggest that it creates subject matter jurisdiction by consent. The statute authorizes a limited *in personam* jurisdiction, just as it did under sections 60, 67 and 70. Like a Californian who committed a tort in Illinois and cannot be subjected to an *in personam* judgment in Illinois without service in this state, or actual consent, or implied consent from filing a general appearance, the defendant under § 2a(7) must have consented, or filed a general appearance, or filed a claim which was deemed to be a consent. In both instances the court had a subject matter jurisdiction by statute.

Interim rule section D(3)(b) indicates a lack of understanding of subject matter jurisdiction and permits it to be established if "the parties to the proceeding consent to entry of the judgment or order by the bankruptcy judge." There is no statutory foundation upon which the subject matter jurisdiction rests; it rests merely upon an order of court. The Bankruptcy Act "consent jurisdiction" cases are no precedent for it.

The most confusing aspect of the summary jurisdiction usage is that the term frequently was used to describe the jurisdiction of the bankruptcy court. The correct usage was to describe the bankruptcy authority of the district courts as courts of bankruptcy. The courts of bankruptcy (i.e., district courts) had a summary jurisdiction, that is, an *in rem* jurisdiction. Because of the fact that the district courts when not acting as courts of bankruptcy also had a plenary jurisdiction, it became quite common to say that district courts had plenary jurisdiction and that bankruptcy courts had summary jurisdiction. While operating in a bankruptcy context, each of them had only a summary jurisdiction. The district court had a plenary jurisdiction with respect to collection proceedings which might be brought as an action against a foreign state (§ 1330), or a federal question (§ 1331), or diversity (§ 1332), or admiralty (§ 1333), or commerce (§ 1337) or patents (§ 1338), and so forth. As a court of bankruptcy, it had a summary jurisdiction, originally an *in rem* jurisdiction limited to property *in custodia legis* and later expanded to include limited *in personam* proceedings brought by trustees or receivers to set aside preferences, avoid liens, and act as a bona fide purchaser, or to collect upon state law actions with the deemed consent of the adversary party. The summary jurisdiction of the bankruptcy court was the same as the summary jurisdiction of the district court.

From the standpoint of jurisdiction, the courts of bankruptcy are not now, and in the past have not been, different from other federal courts with respect to their source of jurisdiction nor with respect to their limited jurisdiction.

The Judicial Code picks up from the Constitution and

(a) provides for original and exclusive jurisdiction of the Supreme Court in § 1251 and appellate jurisdiction in §§ 1252–1254, and 1257 and 1258; (28 U.S.C. §§ 1251–54, 57 and 58);

(b) provides for appellate jurisdiction of the courts of appeals in §§ 1291–1295; (28 U.S.C. §§ 1291–95); and

(c) provides for original jurisdiction of the district courts in §§ 1330–1364. (28 U.S.C. §§ 1330–1364).

■ Until the enactment of Title II of the Reform Act, the Judicial Code did not contain any reference to bankruptcy jurisdiction, other than § 1334, to be discussed below.[16] Under the four bankruptcy acts

---

does not interpose objection to the summary jurisdiction of the court of bankruptcy, by answer or motion filed before the expiration of the time fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction."

**16.** Bankruptcy appellate jurisdiction was not provided for in the Judicial Code but was in the Bankruptcy Act § 24 (11 U.S.C. § 47) and Bankruptcy Rules 801–814. The Bankruptcy Rules have the force of a statute because they were authorized by Congress, adopted by the Supreme Court, and filed with Congress.

which preceded the Bankruptcy Reform Act, court jurisdiction was provided in the bankruptcy act itself:

 (a) Act of 1800—district court and commissioner appointed by the district court; [17]

 (b) Act of 1841—district court and circuit court; [18]

 (c) Act of 1867—district court, circuit court,[19] and register; state court could collect debts up to $500;

 (d) Act of 1898—district court and referee.[20]

The Seventh Amendment to the Constitution provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

The Seventh Amendment expressly applied only to actions at common law, and so it never was applicable to any cases or proceedings under any of the bankruptcy acts, which were conducted under summary process.

The law is so clear that the creation of court jurisdiction is statutory that it is somewhat surprising that the respective circuit councils and district courts swallowed the bait offered by the Administrative Office and adopted the interim rule.

"Federal courts are courts of limited jurisdiction... Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction. Again, this reflects the constitutional source of power: apart from [the Supreme] Court, that power exists 'in such inferior Courts as the congress may from time to time ordain and establish.' Art. III, § 1.

Subject matter jurisdiction, then, is an Article III as well as a statutory requirement: it functions as a restriction on federal power and contributes to the characterization of the federal sovereign." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 102 S.Ct. 2099, 2104, 72 L.Ed. 492 (1982); *M.C. & L.M. Railway Co. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1883).

Subject matter jurisdiction is so important, moreover, that absence of it must be raised at any time, *sua sponte,* by a court at any level. Not only is the absence of subject matter jurisdiction critical, but so also is the failure to state affirmatively the existence of subject matter jurisdiction. *Preston v. Purtell,* 410 F.2d 234, 236 (7 Cir.1969); *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7 Cir.1982); *Daniel Hale Williams Mem. v. City of Chicago,* 407 F.Supp. 342 (N.D.Ill.1976); *Gyromat Corp. v. H.G. Fischer & Co.,* 167 USPQ 326 (N.D. Ill.1970).

Another loose usage of the word, jurisdiction, in bankruptcy circles derived from *Lockwood v. Exchange Bank,* 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903) in which the Supreme Court held that property which had been declared exempt in an originating petition did not come within an estate and thus was not within the powers of the bankruptcy court. There is a myriad of decisions and treatise statements which have misunderstood *Lockwood* and have declared that under the Bankruptcy Act bankruptcy courts did not have jurisdiction over exempt property, which is poppycock. Once the bankruptcy court declared an item of property exempt, the court lost power over that property, but not jurisdiction, and the writers have failed to distinguish between power and jurisdiction. A simple method

---

**17.** See note 8, supra.

**18.** An Act to Establish a Uniform System of Bankruptcy Throughout the United States, passed August 19, 1841, 5 Stat. 440, repealed March 3, 1843, 5 Stat. 614.

**19.** The Bankruptcy Act of 1867, passed March 2, 1867, ch. 176, 14 Stat. 517, repealed June 7, 1878, 20 Stat. 99.

**20.** The Bankruptcy Act of 1898, passed July 1, 1898, 30 Stat. 544, ch. 541, repealed November 8, 1978, Pub.L. 95–598.

of proof is to assume that on Monday the bankruptcy court declares a bed to be exempt property and on Tuesday vacates the exemption. If the court had lost jurisdiction, it could not have vacated the exemption and returned the property to the estate because no court can create its own jurisdiction. The declaration of exemption merely terminated the power of the bankruptcy court to deal with the property and did not affect its jurisdiction. In *Lockwood*, the exempt property never had been a part of the estate.

## COURTS OF BANKRUPTCY

"Courts of bankruptcy" was the caption of the first part of the Bankruptcy Act of 1867, which provided in part,

"§ 1... That the several district courts of the United States be, and they here-

by are, constituted courts of bankruptcy ..."

It is worthwhile to devote some space to "courts of bankruptcy" because of the continuous and deliberate misuse of the term by the Administrative Office, the Judicial Conference, and the Department of Justice.[21]

As initially passed, the Bankruptcy Act of 1898 provided, in part,

"§ 1(8) 'Courts of bankruptcy' shall include the district courts of the United States and of the Territories and the Indian Territory, and of Alaska ..."

"§ 2. That the courts of bankruptcy as hereinafter defined, viz., the district courts of the United States in the several States, the Supreme Court of the District of Columbia, the district courts of the several Territories, and the Unit-

---

21. Representatives of the Judicial Conference, the Administrative Office, and the Department of Justice were present at a November 10, 1982 hearing of the Subcommittee on Courts of the Senate at which Judge Richard L. Merrick testified and they had access to his prepared statement and answer to interrogatories in which he stated:

Q. "What is the status of the interim rules ..."

A. "The rule" was adopted by the various judicial circuits late in September on the basis of a September 27 letter from the Administrative Office of the United States Courts over the signature of William E. Foley, Director. At that time neither the circuit judges nor the district judges were aware that the two authorities which Mr. Foley gave as providing a juridical basis for "the Rule" were both mis-quotations.

The first authority cited by Mr. Foley was Rule 927 of the Rules of Bankruptcy Procedure, which he said provides that "each district court ... may from time to time make and amend rules governing practice and procedure ..." In fact the Rule provides that "each district court ... may from time to time make and amend rules governing practice and procedure ... not inconsistent with these rules." (underscoring supplied).

The proposal of "the Rule" that the bankruptcy judges should act as special masters or referees is not consistent with the Rules of Bankruptcy Procedure, which contemplate that bankruptcy judges shall act in a judicial manner and shall issue final orders. Also "the Rule" is not "governing practice and procedure" but is establishing jurisdiction for the bankruptcy court. Most practitioners feel that what the Congress can not do constitu-

tionally by statute, the district courts can not do constitutionally by rule.

The second source of authority relied upon by Mr. Foley, and misquoted, is Section 105 of the Bankruptcy Code. Mr. Foley's letter states that "the attached rule (the Rule) is an interim measure by which district courts may delegate many of their bankruptcy powers to bankruptcy judges. The authority for this is found in Section 105 ... which gives courts of bankruptcy the power to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." (underscoring supplied).

Contrary to what Mr. Foley suggests, section 105 does not refer to "courts of bankruptcy", (i.e. district courts) but refers to "bankruptcy court," (i.e. bankruptcy court).

Sec. 105 (11 U.S.C. § 105):

POWER OF COURT

(a) The bankruptcy court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.

There is no way by which a bankruptcy court could issue an order which delegated to itself powers of the district court. It is contrary to the basics of jurisprudence for a court to create its own jurisdiction.

Another position frequently taken by bankruptcy specialists is that "the Rule" is invalid because it is inconsistent with two of the Federal Rules of Civil Procedure, Rule 53(e)(2) and Rule 83. Because the Federal Rules have the force of a statute they cannot be controverted by local rules of district courts.

ed States Courts in the Indian Territory and the District of Alaska, are hereby made courts of bankruptcy ..."

The more widely known version of these two sections results from amendments of 1926, and as amended, reads,

"§ 1(10) 'Courts of bankruptcy' shall include the United States district courts and the district courts of the Territories and possessions to which this Act is or may hereafter be applicable;"

"§ 2a The Courts of the United States hereinbefore defined as courts of bankruptcy are hereby created courts of bankruptcy ..."

Act of May 27, 1926, 44 Stat. 662.

■ There has been no variation in the meaning of "courts of bankruptcy" for more than one century. Broadly defined, it means district courts, and it always has meant district courts. That meaning has been widely recognized as a term of art. Stated in the reverse, "courts of bankruptcy" never had meant referees, and never has meant bankruptcy courts. This meaning is known to bankruptcy judges, scholars and practitioners. It probably was not known to circuit councils and to district judges in the fall of 1982, which permitted them to appear to have been abused by the Judicial Conference and the Administrative Office. The meaning of "courts of bankruptcy" and "bankruptcy court" was known to the Administrative Office in the fall of 1982 when the second directive was distributed respecting an interim rule.[22] Mr. Foley's letter of December 3, 1982, states in part,

"The attached model rule is intended to be an interim measure, by which district courts may delegate many of their bankruptcy powers to bankruptcy judges. The authority for that delegation is found in section 105 of the 1978 act, which gives courts of bankruptcy [sic] the power to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.' " (underscoring supplied).

Section 105 will be discussed later in greater detail. Suffice it to say at this point that it reads, in part,

"§ 105(a) The bankruptcy court may ..." (underscoring supplied).

Section 105 does not mention "courts of bankruptcy", it does not refer to "courts of bankruptcy', it does not refer to district courts.

The Administrative Office was faced with the logistical problem of transferring the jurisdiction which it said lay with the district court from the district court to the bankruptcy court. To do so it had to invent a means of delegation because none existed upon which it could rely. The ploy selected was not readily apparent to someone not familiar with the Bankruptcy Code, such as a district court judge or circuit court judge, who might not have recognized that § 105 said "the bankruptcy court" and not "courts of bankruptcy", or if he had recognized the substitution might not have appreciated the significance of it.

It is not necessary to analyze *Northern Pipeline* in detail in order to establish the invalidity of the interim rule, but a short analysis will follow to demonstrate additional reasons that the rule is invalid. Assuming, *arguendo*, that the district court has a bankruptcy jurisdiction from whatever source, how does that jurisdiction become transmitted to a bankruptcy court? Mr. Foley's letter of December 3, 1982, cited two principal avenues of transmission.

### § 105 of the Bankruptcy Code

■ In the immediately preceding paragraphs it was demonstrated that the Administrative Office had misquoted § 105 and had given to the district court a power which the Bankruptcy Code had given to the bankruptcy court. This and other misquotations by the Administrative Office were an immediate warning to anybody familiar with bankruptcy law. If the citations had been valid, it would not have been necessary for the Administrative Office to misquote them. The fact of the misquota-

---

**22.** See note 21, supra.

tions was circumstantial evidence of invalidity. § 105 of the Bankruptcy Code, provides, in part, as follows:

"(a) The bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

The legislative history indicates that the purpose of § 105 was to continue and to spell out expressly the general authority of all courts to enforce their orders, as provided in the All Writs statute.

"§ 1651(a). The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." (28 U.S.C. § 1651(a)).

§ 105 also was designed to continue for a bankruptcy court the powers which had been expressly authorized to district courts (courts of bankruptcy) under § 2a(15) of the Bankruptcy Act.

"a. The courts of the United States hereinbefore defined as courts of bankruptcy ... are hereby invested ... with such jurisdiction ... as will enable them to ...

(15) Make such orders, issue such process and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this Act: ..."

█ § 105 so clearly relates to process and to methods of enforcing orders and judgments that it tests the credulity of anybody who has had more than two years of law school to believe that the Judicial Conference, the Administrative Office, or the Department of Justice honestly considered that this section could be the basis of a delegation of jurisdiction, even if the section had related to district courts, as the Administrative Office said that it did. It is equally absurd to suggest that the bankruptcy court, to which the section was directed, would have an ability to create its own jurisdiction.

### Bankruptcy Rule 927

The second citation which the Administrative Office gives as authority for the validity of the interim rule is Bankruptcy Rule 927, which provides, in part, as follows:

"Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing practice and procedure under the Act not inconsistent with these rules." (underscoring supplied). (Bankr.R. 927)

The underscored portion of Rule 927 was omitted by the Administrative Office, just as that office omitted "not inconsistent with these rules" when previously it had cited Rule 83 of the Federal Rules of Civil Procedure as authority:

"Each district court by action of a majority of the judges thereof may from time to time make and amend rules governing its practice not inconsistent with these rules .... In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules." (underscoring supplied). (Fed.R.Civ.P. 83)

█ The phrase "not inconsistent with these rules" is a key to the rule making powers of courts because the delegation of rule making power is partial only, procedural and not substantive. Congress retained unto itself all aspects of the federal court authority other than the mechanical operations of the courtroom and the necessary functions preceding and following trial.[23]

### § 2071—Rule-making power generally

"The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and

---

**23.** *Bankruptcy Rule 928*
"These rules shall not be construed to extend or limit the jurisdiction of courts of bankruptcy over subject matter." (Bankr.R. 928).

*Civil Procedure Rule 82*
"These rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein..." (Fed.R.Civ.P. 82)

rules of practice and procedure prescribed by the Supreme Court." (28 U.S.C. § 2071)

### § 2072—Rules of Civil Procedure

"The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure of the district courts and courts of appeals of the United States in civil actions..." (28 U.S.C. § 2072).

### § 2075—Bankruptcy Rules

"The Supreme Court shall have the power to prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11..." (28 U.S.C. § 2075).

### § 331—Judicial Conference of the United States

"[The Conference] shall submit suggestions and recommendations to the various courts to promote uniformity of management procedures and the expeditious conduct of court business. The Conference is authorized to exercise [disciplinary] authority ... as the Conference or through a standing committee... The Conference may also prescribe and modify rules for the exercise of [disciplinary] authority...

The Conference shall also carry on a continuous study of the operation and effect of the general rules of practice and procedure now or hereafter in use as prescribed by the Supreme Court for the other courts of the United States pursuant to law. Such changes in and additions to those rules as the Conference may deem desirable to promote simplicity in procedure, fairness in administration, the just determination of litigation, and the elimination of unjustifiable expense and delay shall be recommended by the Conference from time to time to the Supreme Court for its consideration and adoption, modification or rejection, in accordance with law..." (28 U.S.C. § 331).

The interim rule was developed by the Committee on the Administration of the Bankruptcy System, of which Judge Robert E. DeMascio of the District Court of Eastern Michigan is the chairman. In a slightly different form the interim rule was proposed to federal judges by the Director of the Administrative Office on September 27, 1982 (not needed because of an extension of the stay) and again on December 3, 1982. Lawyers who are familiar with the development of the rule and its legislative uses in the fall of 1982 and the winter of 1982–1983 fault the Judicial Conference in four major respects:

1. acting beyond its statutory authority,
2. lobbying in Congress,
3. misleading the circuit councils, and
4. misleading the district courts.

The task which confronted the Judicial Conference as it insinuated its way into a legislative role was to:

1. show that the district courts retained a bankruptcy jurisdiction, and
2. devise a method of transferring to the bankruptcy courts the maximum amount of that jurisdiction consistent with *Northern Pipeline.*

The Judicial Conference was created by Congress with specific powers described in § 331 of the Judicial Code. It is composed of the chief judge of each circuit and one district judge from each circuit elected annually at the circuit conference, and is presided over by the Chief Justice. It is authorized to make suggestions and recommendations respecting court management and may establish rules respecting the exercise of disciplinary authority.

The Judicial Conference is not authorized to lobby in Congress, as it has done extensively for the last nine months. It does not have the authority to establish jurisdiction for inferior federal courts, which is a Congressional prerogative, nor to establish nor promulgate rules not associated with discipline. Other than discipline, its rule making responsibility is in making suggestions to the Supreme Court.

During the fall and early winter of 1982 the Judicial Conference had frequent contacts with members of the Congress in which it advised them that the interim rule made prompt legislation unnecessary. A number of Senators, in particular, advised their constituents that they had not stressed legislation in reliance upon the assurances of the Judicial Conference that there was no need for it.

§ 332. *Judicial Councils of Circuits*

"...(d)(1) Each judicial council shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit..." (28 U.S.C. § 332(d)(1)).

### Chapter 41—Administrative Office of the United States

"§ 604(a). The Director shall be administrative officer of the courts and ... shall;

(3) Submit to the annual meeting of the Judicial Conference of the United States ... a report of the activities of the Administrative Office and the state of the business of the courts, together with the statistical data submitted to the chief judge of the circuits...

(13) Lay before Congress, annually, statistical tables that will accurately reflect the business transacted by the several bankruptcy courts, and all other pertinent data relating to such courts;

(e) The Director may promulgate appropriate rules and regulations approved by the conference and not inconsistent with any provision of law, to assist him in the performance of the duties conferred upon him [respecting magistrates]..." (28 U.S.C. § 604(a)).

The Administrative Office of the United States is provided for primarily in §§ 601–611 of the Judicial Code. Essentially it is under the supervision of the Judicial Conference, but the Director and Deputy Director are appointed by the Supreme Court. Primarily the Administrative Office is a management and reporting agency. It does not have the authority to make or disseminate rules respecting the jurisdiction of federal courts, it does not have authority to encourage federal judges to lobby,[24] it does not have the authority to lobby itself.

In its letter of December 3, 1982 to federal judges and clerks the Administrative Office misled the respective judicial circuit councils because the Administrative Office knew that:

1. Rule 927 of the Bankruptcy Rules applies to practice and procedure and not jurisdiction, and

2. Rule 927 does not permit local rules which are inconsistent with Bankruptcy Rules; the interim rule is inconsistent, and

3. Its directive of December 3, 1982, misquoted Rule 927, and

4. Section 105 of the Bankruptcy Code relates to bankruptcy courts and not district courts,

5. Its directive of December 3, 1982 misquoted Section 105, and

6. Section 105 relates to orders, process and judgment and not to jurisdiction.[25]

There is no authority for the Judicial Conference nor the Administrative Office to lobby Congress, to expend federal funds in a lobbying effort, nor to encourage federal judges to engage in a lobbying effort.

In short, there is no rule-making authority at any level which permits the respective activities of the Judicial Conference, the Administrative Office, the circuit councils, or the district courts to advance or to adopt the interim rule. All of them are acting unlawfully. Each of them is exceeding its authority because their assigned responsibilities are judicial or administrative; in no event are they legislative or political.[26]

---

**24.** See Appendix II.

**25.** See note 21, supra.

**26.** "The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial. This separation is not merely a matter of convenience or of

It is not necessary to examine each of the statutory sections in detail. All of them deal with the same basic subject in the same general way. The courts and their administrative officials may make rules or regulations respecting the business operations of the courts and the practice and procedures to be observed in the courts. There is nothing which grants to any court or to any official office or officer any authority to make or recommend rules or procedures other than those described. There is nothing in any of the statutes which suggests in the slightest way that any of those bodies may increase, reduce or modify the jurisdiction of bankruptcy courts or of any other courts. That would be trespassing upon terrain reserved to the Constitution or to the Congress. There is nothing in any of the statutes which suggests in the slightest way that any of these bodies may increase, reduce or modify the scope of the Bankruptcy Rules or the Federal Rules of Civil Procedure, both of which have the force of a statute because of the manner in which they were authorized and submitted to the Congress. In fact, both the Bankruptcy Rules (Rule 927) and the Rules of Civil Procedure (Rule 83) state expressly that permissible procedural rules and orders shall be *"not inconsistent with these rules."*

*Miner v. Atlass,* 363 U.S. 641, 80 S.Ct. 1300, 4 L.Ed.2d 1462 (1960) is a particularly appropriate case to consider under the present circumstances; it related to a local discovery rule in admiralty cases. Rule 44 of the General Admiralty Rules provided:

"In suits in admiralty in all cases not provided for by these rules or by statute, the district courts are to regulate their practice in such a manner as they deem most expedient for the due administration of justice, *provided the same are not inconsistent with these rules.* 363 U.S. 647, 80 S.Ct. 1304 (Emphasis in original).

The Court held that the taking of discovery depositions permitted by the local rule was inconsistent with existing admiralty rules and thus invalid. Many examples of inconsistencies between the interim rule and the Bankruptcy Rules could be catalogued, but the absence of an ability to conduct jury trials under the interim rule is enough.

Rule 82 of the Rules of Civil Procedure provides, in part,

"These rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein." (Fed.R.Civ.P. 82)

Rule 928 of the Bankruptcy Rules provides,

"These rules shall not be construed to extend or limit the jurisdiction of courts of bankruptcy over subject matter." (Bankr.R. 928)

A listing of the approved scope of rule-making statutory sections suggests that the creation by the Judicial Conference of the jurisdiction delegating rule is a sleight-of-hand means of postponing permanent legislation.

*Judicial Code:*

§ 2071—"rules for the conduct of their business ... rules of practice and procedure"

§ 2072—"forms of process, writs, pleadings and motions and the practice and procedure"

---

governmental mechanism. Its object is basic and vital, *Springer v. Philippine Islands,* 277 U.S. 189, 201 [48 S.Ct. 480, 482, 72 L.Ed. 845], namely, to preclude a commingling of these essentially different powers of government in the same hands. And this object is none the less apparent and controlling because there is to be found in the Constitution an occasional specific provision conferring upon a given department certain functions, which, by their nature, would otherwise fall within the general scope of the powers of another. Such exceptions serve rather to emphasize the generally inviolate character of the plan.

If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others— independent not in the sense that they shall not cooperate to the common end of carrying into effect the purposes of the Constitution, but in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments." *O'Donoghue v. United States,* 289 U.S. 516, 530, 53 S.Ct. 740, 743, 77 L.Ed. 1356 (1933).

§ 331—"management procedures and the expeditious conduct of court business" "study of the operation and effect of general rules of practice and procedure" "rules . . . to promote simplicity in procedure"

*Federal Rules of Civil Procedure:*

Rule 83—"rules governing practice" "regulate their practice"

*Bankruptcy Rules:*

Rule 927—"rules governing practice and procedure"

 It is difficult for this Court to take seriously an argument that Rule 927 permits the adoption of an interim rule creating jurisdiction for a bankruptcy court when it is so clear that Rule 927 limits rule-making power to those "governing practice and procedure". Process, practice, procedure, pleadings, motions are all precise terms describing the mechanical aspects of a trial. None of them relates to jurisdiction. All of the rule-making statutes and rules are so limited because the drafters of the statutes and rules recognized that the granting of jurisdiction is either by constitution or by statute and cannot be done by a court nor by an administrative office of a court.

The same kind of unwarranted distortion by the Judicial Conference is apparent respecting enforcement orders.

*Judicial Code:*

§ 1651—"all writs, necessary or appropriate in aid of their respective jurisdictions"

*Bankruptcy Act:*

§ 2a(15) "make such orders, issue such process, and enter such judgments . . . as may be necessary"

*Bankruptcy Code:*

§ 105 "issue any order, process or judgment that is necessary"

It is inconceivable that anybody could contend conscientiously that statutes of this nature permit courts to delegate their jurisdiction or create jurisdiction for themselves. It was difficult for many persons to take the interim rule seriously when it first ap-peared because it is so contrary to existing court structures and operations. Jurisprudentially it is impossible for either Rule 927 or Section 105 to perform the task assigned to it by the Judicial Conference of creating jurisdiction for bankruptcy courts.

### §§ 404 and 405 of Bankruptcy Reform Act

The pattern which the Congress established under the Reform Act was to:

1. place all bankruptcy authority within a single court,

2. have the substantive changes in the law become effective October 1, 1979,

3. have most of the procedural changes take effect on October 1, 1979, reserving until April 1, 1984, all fundamental changes in court structure, and

4. have any cases filed under the Bankruptcy Act and still pending be administered as if the act had not been repealed.

Title IV of the Reform Act was entitled "transition" and was intended to accomplish a smooth changeover from the Act to the Code during the period from October 1, 1979 until April 1, 1984.

§ 404(a) of the Reform Act continues in effect through March 31, 1984 the court structure which existed on September 30, 1979, just as § 403 continues in effect as to all cases pending on September 30, 1979, the substantive law which applied on that date, even though § 401(a) repealed the Bankruptcy Act proper. § 404(a) provides:

"§ 404(a). The courts of bankruptcy as defined under section 1(10) of the Bankruptcy Act, created under section 2a of the Bankruptcy Act, and existing on September 30, 1979, shall <u>continue</u> through March 31, 1984, to be the courts of bankruptcy for the purposes of this Act and the amendments made by this Act. Each of the courts of bankruptcy so <u>continued</u> shall constitute a separate department of the district court that is such a court of bankruptcy under the Bankruptcy Act." (underscoring supplied).

Courts of bankruptcy and summary jurisdiction were discussed above at pages 43–137, where it was pointed out that the basic bankruptcy jurisdiction of the district courts resulted from their being courts of bankruptcy. Otherwise district courts would not have been able to hear bankruptcy cases at all. There was no feasible method of continuing the administration of Bankruptcy Act cases in the same manner as before unless the substantive features of the old law were implemented by the procedural provisions of the old law.

It will be noted, as shown by the underscoring above, § 404(a) speaks of the courts of bankruptcy as being *continued.* In its interim rule the Judicial Conference attempted to create the impression that the Congress had purposely established jurisdiction for existing bankruptcy courts, as follows:

"(b) The bankruptcy court *constituted* by § 404 of Public Law 95–598 shall continue to be known as the United States Bankruptcy Court..." (emphasis supplied).

§ 404 did not *constitute* any court. It did not create anything; it merely *continued* the district courts as courts of bankruptcy; they had been *constituted* courts of bankruptcy in 1867 and again in 1898. To an ordinary observer it seems unconscionable that the Judicial Conference should adopt such shallow methods to achieve its ends.

§ 405 provides in part:

"(a)(1) All cases commenced under title 11 of the United States Code during the transition period shall be referred to the United States bankruptcy judges. The United States bankruptcy judges may exercise in such cases the jurisdiction and powers conferred by subsection (b) of this section on the courts of bankruptcy con-tinued by section 404(a) of this Act, and all proceedings in such cases shall be before the United States bankruptcy judges, except ...

(b) During the transition period, the amendments made by sections 241 ... of this act shall apply to the courts of bankruptcy continued by section 404(a) of this Act the same as such amendments apply to the United States bankruptcy courts established under section 201 of this act." (underscoring supplied).

Section 405(a) read alone, appears in its first sentence to provide bankruptcy authority to the United States bankruptcy judges because it causes all cases to be referred to them. The second sentence, however, provides that they exercise "the jurisdiction and powers conferred" by § 405(b) on the district courts. Subsection 405(b) states that § 241 shall apply, and the latter is the section which was held unconstitutional in the *Northern Pipeline* case. Consequently, § 405 does not advance the cause of the interim rule at all. § 241 controls jurisdiction after April 1, 1984 standing on its own. § 241 controls jurisdiction before April 1, 1984 because of a specification in § 405(b).

*Fifth Amendment, § 455 and Canon 3*

§ 455 of the Judicial Code provides in part as follows:

"(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." (28 U.S.C. § 455).

 This section causes to be disqualified in any proceeding contesting the validity of the interim rule any member of a circuit council which adopted the interim rule, as well as any district judge who voted for the rule. Normal behaviour will cause them to wish to vindicate their previous decisions in adopting the rule. Canon 3 of the Code of Judicial Conduct is similar. It generally is believed that a substantial number of the district judges and a lesser percentage of the circuit judges have engaged in direct lobbying with members of the Congress and in doing so have advised them that there is no emergency requiring the passage of immediate legislation because the interim rule of the Judicial Conference has everything under control. If any of those judges who assured a Congressman in December should now hold the rule invalid, he would lose all credibility

with that Congressman forever. It would be contrary to human nature to expect such a judge to decide against the validity of the rule.

The bias of the district and circuit judges is apparent. They will uphold the rule; the opponent of the rule does not have an opportunity to be heard in an impartial forum. With a single exception every district and circuit judge who has passed on the rule has upheld it, as was predicted. Not one of them has disqualified himself. Few of them even have addressed the legal questions raised by the rule. An example in point is *In re Northland Point Partners*,[27] decided by Judge Robert E. DeMascio of the Eastern District of Michigan, on January 7, 1983, a mere 10 days after the rule became operative. Judge DeMascio is Chairman of the Judicial Conference Committee on the Administration of the Bankruptcy System and submitted the rule to the Conference on September 23, 1982. Predictably he upheld the rule, relying upon the same misquoted authority as had been advanced by the Director of the Administrative Office. Immediately Judge Feikens, chief judge of the same district, mailed a copy of the order to the Chief Judges of all of the other districts, an unprecedented action, but a clear demonstration of the bias of the district judges.[28]

It has been suggested that the bias of the district and circuit judges resulting from their desire of self-vindication prevents an appeal from a bankruptcy court to an impartial tribunal, thereby denying due process to an unsuccessful litigant at the bankruptcy court level. This has the effect of making non-appealable the final order of a special court of limited jurisdiction. Educators express the view that it is both unethical and unlawful for most circuit judges and district judges to hear an appeal. Many of them feel that it was improper for the Chief Justice to sit on the *Northern Pipeline* case, because, in substance, it was his amendment which was under scrutiny.

To date there is no record that any judge has made the disclosure permitted by § 455(e),

"Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." (28 U.S.C. § 455).

It would appear that the minimum disclosure requirement would be:

1. membership in the Federal Judges Association;

2. copies of all correspondence and memoranda with the Judicial Conference, Administrative Office, and other federal judges, on the subject of the interim rule or bankruptcy jurisdictional legislation;

3. copies of all correspondence and memoranda with members of the Congress and their staffs on the subject of the interim rule or bankruptcy jurisdiction legislation; and

4. summaries of all telephone conversations with any persons or organizations listed above on either subject.

*Meaning of Northern Pipeline*

There have not been uniform interpretations of the four opinions which constitute the *Northern Pipeline* decision, so that it is significant what the nine participants themselves believe is the decision of the case.

At page 2882 the Chief Justice stated,

"... the Court does *not* hold today that Congress' broad grant of jurisdiction to the new bankruptcy courts is generally inconsistent with Article III of the Constitution. Rather, the Court's holding is limited to the proposition stated by Justice Rehnquist ... that a 'traditional' state commonlaw action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must ... be heard by an 'Article III court' if it is to be heard by any court or

---

27. 26 B.R. 1019 (D.C.E.D.Mich.1983).

28. See Appendix III.

agency of the United States. This limited holding, of course, does not suggest that there is something inherently unconstitutional about the new bankruptcy courts; nor does it preclude such courts from adjudicating all but a relatively narrow category of claims; 'arising under' or 'arising in or related to cases under' the Bankruptcy Act.

It will not be necessary for Congress, in order to meet the requirements of the court's holding, to undertake a radical restructuring of the present system of bankruptcy administration. The problems arising from today's judgment can be resolved simply by providing that ancillary common-law actions such as the one involved in this case, be routed to the United States district court of which the bankruptcy court is an adjunct."

For the moment no comment will be made on the separate dissenting opinion of the Chief Justice, other than to state that under the definition of inappropriate state law causes of action suggested by Justice Rehnquist, very few reorganizations or major liquidations could be completed without ancillary proceedings in the district courts or state courts. The Chief Justice's summary of the plurality opinion and the concurring opinion is:

"a 'traditional' state commonlaw action ... must ... be heard by an Article III Court..."

The dissenting opinion written by Justice White states, in part, at pages 2883–4,

"There are, I believe, two separate grounds for today's decision. First non-Article III judges, regardless of whether they are labelled 'adjuncts' to Article III courts or 'Article I judges', may consider only controversies arising out of federal law. Because the immediate controversy in this case—Northern Pipeline's claim against Marathon—arises out of state law, it may only be adjudicated, within the federal system, by an Article III court.

"... Even if the Court is correct that such a state law claim cannot be heard by a bankruptcy judge, there is no basis for

doing more than declaring the section unconstitutional as applied to the claim against Marathon, leaving the section otherwise intact. [Footnote 3. The plurality attempts to justify its sweeping invalidation of § 241(a), because of its inclusion of state-law claims, by suggesting that this statutory provision is nonseverable. Ante, at n. 40. The concurring Justices specifically adopt this argument as the reason for their decision to join the judgment of the Court]".

At page 2888, "Whatever is invalid should be declared to be such; the rest of the 1978 Act should be left alone. I can account for the majority's inexplicably heavy hand in this case only by assuming that the Court has once again lost its conceptual bearings when confronted with the difficult problem of the nature and role of Article I Courts."

The concurring opinion of Justice Rehnquist and O'Connor states, in part, at pages 2881–2,

"From the record before us, the lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789 .... the claims of Northern arise entirely under state law...

I would, therefore, hold so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit over Marathon's objections to be violative of Art. III of the United States Constitution. Because I agree with the plurality that this grant of authority is not readily severable from the remaining grant of authority to Bankruptcy Courts under § 241(a), see ante, at 2880, n. 40, I concur in the judgment."

The plurality opinion written by Justice Brennan, states in part, at page 2880,

"Having concluded that the broad grant of jurisdiction to the bankruptcy courts contained in § 241(a) is unconstitutional, we must now determine whether

our holding should be applied retroactively to the effective date of the act. [Footnote 40. It is clear that at the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against Marathon. As part of a comprehensive restructuring of the bankruptcy laws, Congress has vested jurisdiction over this and all matters related to cases under title 11 in a single non-art. III court, and has done so pursuant to a single statutory grant. In these circumstances we cannot conclude that if Congress were aware that the grant of jurisdiction could not constitutionally encompass this and similar claims, it would simply remove the jurisdiction of the bankruptcy court over these matters, leaving the jurisdictional provision and adjudicating structure intact with respect to other types of claims, and thus subject to Art. III constitutional challenge on a claim-by-claim basis. Indeed, we note that one of the express purposes of the Act was to ensure adjudication of all claims in a single forum and to avoid delay and expense of jurisdictional disputes... We think that it is for Congress to determine the proper manner of restraining the Bankruptcy Act of 1978 to conform to the requirements of Art. III in the way that will best effectuate the legislative purpose]."

The best way of determining what *Northern Pipeline* decided is to look at what the Justices say that it decided. The plurality of four said that all of § 241(a) is unconstitutional and that the restructuring should be done by Congress. The concurring Justices Rehnquist and O'Connor state that the plurality went too far in its holding; it could have limited its opinion to the unconstitutionality of hearing state law proceedings and left the question of bankruptcy administration to another day. Because the two propositions cannot be separated readily, what might or might not have been good on its own must fall with what is unquestionably bad, and the corrections should be made by Congress.

The dissenting view of Justices White and Powell states that the view of the majority (Brennan, Marshall, Blackmun, Stevens, Rehnquist and O'Connor) is that the non-severability factor causes all of § 241(a) to fall. The dissenting judges believe that the conclusion is wrong but acknowledge that it is the decision of the Court. Thus there is, an 8 to 1 conclusion of the participating justices that the 6 to 3 decision of the court is that all of the bankruptcy court jurisdiction of § 241(a) is invalid. The constitutionality of the grant of authority to the district court was not at issue, and there seems to be no doubt about it. That subject, however, is the straw man used frequently in the subjective opinions upholding the validity of the rule.

All of the Justices who spoke on the subject concluded that Congress should provide the solution, and the Court provided two stays of judgment of approximately three months each to permit that to be accomplished. There never was a suggestion in *Northern Pipeline* that a rule adopted by district courts or by a combination of district courts, circuit councils and the Judicial Conference could fill the breach. The Justices recognized that they were dealing with jurisdiction, not process, practice nor procedure.

The *Northern Pipeline* decision, as interpreted by the Justices, is that no court has bankruptcy jurisdiction. Three of the Justices say that the decision is wrong, including the Chief Justice who interprets the decision differently. There is no need for inferior courts to conjecture what the decision of *Northern Pipeline* is. Eight of the Justices have stated it, to wit, § 241(a), which is the jurisdiction and venue portion of the Reform Act, is invalid. A portion of § 1471(c) is unconstitutional; the balance of § 241(a) is so inseparably intertwined with the unconstitutional portion that the remainder cannot stand alone.

### The Interim Rule

The closest thing to a definition of what kinds of matters and proceedings *Northern Pipeline* holds that an Article I Court cannot entertain constitutionally is:

"the stuff of the traditional actions at common law tried at Westminster in 1789."

1789 was the first full year of the United States of America under the Constitution, which was finally ratified in the summer of 1788. In England at that time common law cases were tried before either of two courts.[29] The Court of the King's Bench rode circuit and heard cases by and against the Crown and appeals from the Court of Common Bench. The Court of Common Bench (Common Pleas) sat in Westminster and was a court of general original jurisdiction. The forms of action heard regularly in 1789 in Common Pleas were trespass, trover, ejectment, detinue and replevin, trespass on the case, assumpsit, covenant and debt, which essentially cover common law actions to recover money or property, tangibles or intangibles. Under *Northern Pipeline* all of these have to be heard by a state court or by an Article III court, as would any state statutory causes of action created subsequent to 1789. It is beyond the scope of this opinion to determine what would be the position respecting rights or actions created by colonial or state legislatures between 1607 and 1789 which might have continued in force on a local basis after Union, if there are any such rights or actions.

■ The interim rule purports to derive its authority from Bankruptcy Rule 927 and Rule 83 of the Federal Rules of Civil Procedure which provide respectively for

"rules governing practice and procedure . . . not inconsistent with these rules" and

"rules governing its practice not inconsistent with these rules."

The interim rule is a rule creating jurisdiction, is not limited to practice and procedure, and is inconsistent with the Bankruptcy Rules and with the Rules of Civil Procedure. For example, the interim rule prohibits jury trials by bankruptcy courts; Bankruptcy Rule 115(b) provides for them. The interim rule would permit all of the

facts and issues of *Northern Pipeline* itself to be tried by a bankruptcy court.

■ The entire panorama of the interim rule can be portrayed by a short series of simple questions and answers:

1.
Q. Is jurisdiction always statutory?
A. It is always established by a constitution or by statute, or both.

2.
Q. Is there a statute or constitutional provision authorizing jurisdiction for bankruptcy courts?
A. No.

3.
Q. Do bankruptcy courts have jurisdiction to hear cases or proceedings?
A. No.

4.
Q. Is it constitutional for bankruptcy courts as they exist presently to hear bankruptcy cases or proceedings?
A. It is constitutional for them only to administer federal law; either bankruptcy law or non-bankruptcy federal law.

5.
Q. Is it constitutional for district courts to hear bankruptcy cases and proceedings?
A. Yes, it is constitutional for district courts to hear cases and all proceedings, whether based upon federal or state law.

6.
Q. Is there present statutory authority for district courts to exercise bankruptcy authority?
A. No. The Bankruptcy Reform Act did not contemplate that the district courts would exercise bankruptcy authority. The grant to the district courts was to be exercised by the bankruptcy courts, which delegation was found to be unconstitutionally broad under *Northern Pipeline*.

7.
Q. How have the Judicial Conference, the Administrative Office, district

---

**29.** See Merrick, *Constitutional Chaos,* 2 Nor.Ill. L.Rev. 167, 172 (1982).

courts and courts of appeals found bankruptcy court jurisdiction?

A. By mis-stating the underlying data.

■ As a backdrop to an understanding of the entire problem respecting the validity of the interim rules, several gauges should be kept in mind as a measure of the accuracy of the statements and language in various decisions and opinions, including this one:

1. All of the educators and commentators who have spoken on the subject have stated that the rule is invalid. Unanimity among scholars is rare, and so it is especially significant when it does occur.

2. The Administrative Office, which promulgated the rule, and most of the district courts and courts of appeals which have upheld it have relied upon misquotations and false data in supporting their conclusions. If the rule were valid, they could have cited accurately the Rules and statutory sections upon which they rely.

3. The district and circuit judges who have passed upon the rule have acted unlawfully and unethically and should have recused themselves because of their recognized bias.

One can tell from reading most of the district and circuit court opinions that they appear to be subjectively motivated, that is, the conclusions were reached first and then supporting authority was sought to fill in the spaces. One example will be mentioned here with others to follow. Section 105(a) of the Bankruptcy Code provides, in part, "The *bankruptcy court* may issue any order . . . ." (emphasis supplied). All of the district judges can read and have two law clerks who can read. All of the circuit judges can read and have three law clerks who can read. All of the opinions state that § 105 said "courts of bankruptcy", i.e. district courts. The judges used a section of the Bankruptcy Code describing an order to aid a bankruptcy court in the enforcement of its own decision as authority for a district court to delegate its jurisdiction to a bankruptcy court. It is difficult for any lawyer or layman to believe that a large group of literate individuals can all read "bankruptcy court" and write "courts of bankruptcy", and do it repeatedly, consistently and still conscientiously. It is as though there were a reading disability called "jurislexia" which prevents judges from reading accurately words or passages with which they disagree.

If the judges wish to place the blame upon their law clerks, so be it. Many of the opinions appear to have been written by law clerks. The Administrative Office, however, cannot use that excuse. The error was called to its attention long before it issued its directive of December 3, 1982.[30]

Similarly, all of the district judges and their law clerks and all of the court of appeals judges and their law clerks should know the difference between practice, process, and procedure on the one hand, and jurisdiction on the other hand. Nevertheless, consistently and uniformly they hold that statutes and rules respecting case management, practice, process, and procedure are sufficient to enable district courts to delegate their bankruptcy jurisdiction to bankruptcy courts.

## DISTRICT COURT JURISDICTION

The Supreme Court took an opposite view in *Northern Pipeline,* holding that the significant factor was the nature of the court which was making legal decisions in the case before it and not the nature of the court which was making the administrative decisions affecting courthouse operations; the Article III mystique of the district courts did not rub off on the bankruptcy courts merely because they were called "adjuncts". Although the Court did not relate the colonial background of the Article III provision, it did emphasize the importance of salary and tenure protection.

As a matter of structure the permanent jurisdiction and venue provision of the Re-

---

30. See note 21, supra.

form Act consisted of twelve sections (§§ 1471–82), added to the Judicial Code as Chapter 90 and to become effective April 1, 1984; all of that constituted § 241(a) of the Reform Act. § 405 of the Reform Act caused § 241(a) to be incorporated by reference, so that §§ 1471–82 were operative after October 1, 1979, with respect to cases filed on or after that date. § 1471(a) gave to the district courts the original and exclusive jurisdiction of all cases under the Bankruptcy Code. § 1471(b) gave to the district courts original but not exclusive jurisdiction of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. § 1471(c) gave to the bankruptcy courts authority to "exercise all of the jurisdiction conferred by this section on the district courts." *Northern Pipeline* was a civil proceeding arising in a case under title 11. As a debtor, Northern Pipeline brought a breach of contract action against Marathon Pipe Line Co.

The Administrative Office takes the position that *Northern Pipeline* eliminated only § 1471(c) as unconstitutional and that § 1471(a) and (b) remain intact. The preceding portion of this opinion assumed that position, *arguendo,* to determine whether bankruptcy jurisdiction could have been, and was delegated to the bankruptcy courts by the district courts. This court concluded above at pages 10–38 that:

(a) the district courts did not have a power of delegation, and

(b) did not exercise validly any power of delegation which might have existed.

The rule-making power which had been given to the district courts was limited to practice, process and procedure and did not extend to the creation of a rule granting jurisdiction.

The position taken by the Judicial Conference, the Administrative Office, and many of the courts, particularly the Sixth Circuit Court of Appeals and many district courts, has a superficial resemblance to that contained in law school moot court arguments. The opponents are given opposite sides of an argument which they must defend. They may not desert their assigned roles of making the best case possible for a proposition with which they may disagree intellectually. The groups mentioned above have not made a critical analysis; they have not recognized that every educator who has spoken on the subject has taken the side of invalidity, they either have fabricated their authorities or have relied on authorities fabricated by others. In other words their approach appears not to have been intellectually honest and judicial but has been political and subjective.

▮ The only honest way to consider the issue is to recognize that one of the dominant purposes of the entire Bankruptcy Reform Act was to place within a single court the authority to determine all aspects of a bankruptcy case and its proceedings. Because of the intervention of the Chief Justice the format was switched from an authorized Article III bankruptcy court to an authorized Article III district court whose powers would be exercised by a bankruptcy court. The Congress did not want the district courts to exercise bankruptcy authority; the Congress knew that the district courts were unwilling to exercise bankruptcy authority. Many of the district judges have been contending for years that they are so over-worked that diversity jurisdiction should be eliminated, which would reduce their caseloads by between 20% and 33%.[31] Consequently, any argument that the Congress intended that district courts should retain bankruptcy jurisdiction in the event of the unconstitutionality of § 1471(c) is contrary to reality. If, in the final frantic moments of the conclusion of the 95th Congress, serious doubts had continued to exist about the constitutionality of § 1471(c), it appears almost certain that the bill would not have been enacted; it was too late, after both houses had scheduled adjournment, to restructure completely the entire judicial machinery which was to be used to implement the broad substantive changes.

**31.** See Appendix IV.

The vehicle which became the Bankruptcy Reform Act was H.R. 8200. It had contemplated an Article III bankruptcy court throughout. There was no need for contingency plans in the event of unconstitutionality because the question would not have arisen if the judicial structure had remained an Article III bankruptcy court. §§ 404 and 405 of the Reform Act were not changed to reflect the last minute changes made in § 241(a), specifically, § 1471 of the Judicial Code. Thus, it is contrary to the facts to state that either § 404 or § 405 was written with the present circumstance in mind. They had been written in their present form more than one year before the transfer of jurisdiction to an adjunct had been devised, and they were not designed to contend with that issue. All that § 404 and § 405 were intended to achieve, was to permit Bankruptcy Act cases to continue as before and also to permit the court structure which would be in place permanently after April 1, 1984, to function in the same fashion during the transition period, October 1, 1979—March 31, 1984, with respect to newly filed cases.

### Judicial Code § 1331 and § 1334

Many courts which have assumed the validity of the rule appear to have been looking for some authority to support that predetermined position; they have lighted upon either or both § 1331[32] and § 1334[33] as their foundations; they have built upon sand.

§ 1331 is derived from an earlier statute first adopted in 1875.[34] There was not in effect at that time any bankruptcy act. To say that § 1331 provided bankruptcy jurisdiction is ridiculous. There was no substantive law upon which it could operate when it was enacted. Laws are not created in a vacuum. In any event, the procedural bankruptcy law in the United States always has been adopted as a part of a package including the substantive law. Neither ever has existed without the other.

The powers of the various federal courts were addressed in 1911 with the adoption of the Judicial Code. As a code it expressed most of the powers of all of the federal courts. The jurisdiction and venue of the various courts are set forth in Part IV:

Chapter 81—Supreme Court—§§ 1251–58

Chapter 83—Court of Appeals—§§ 1291–1296

Chapter 85—District Courts—§§ 1330–1364

The jurisdiction granted to the district courts in Chapter 85 covered most of the express powers granted to the Congress by Article I, Section 8 of the Constitution, other than those respecting the military, the District of Columbia, and the coinage of money. Nevertheless, most subjects over which the Congress has been empowered to act have been authorized by detailed specific legislation limited to the precise power under consideration and have not relied on Chapter 85. Examples are the enforcement methods governing the collection of taxes, interstate commerce, postal laws, maritime

**32.** § 1331 is the lineal descendant of "An Act to determine the jurisdiction of Circuit Courts of the United States and to regulate the removal of causes from State Courts, and for other purposes", passed March 3, 1875, ch. 137, 18 Stat. L. 470. It is derived particularly from section 1, which provided in part, "that the circuit courts of the United States shall have original cognizance, concurrent with the Courts of the several States, of all suits of a civil nature ... and arising under the Constitution or Laws of the United States ..."

**33.** § 1334 is derived from §§ 24 and 256 of "an Act To Codify, revise, and amend the laws relating to the judiciary, Pub.L. 475, passed March 3, 1911. As the title suggests it was a compilation of all of the powers of federal

courts into the first Judicial Code. The sections enumerated above were a portion of a litany which established a mechanism of adjudication respecting the powers enumerated in Article I, Section 8 of the Constitution:

"§ 24. The district courts shall have original jurisdiction as follows: ... Nineteenth. of all matters and proceedings in bankruptcy."

"§ 256. The jurisdiction, vested in the Courts of the United States in the cases and proceedings hereinafter mentioned, shall be exclusive of the courts of the several States: ... Sixth. of all matters and proceedings in bankruptcy."

Sixty-First Congress, Sess. III, chap. 231.

**34.** See note 32, supra.

statutes, and patent laws. It is contrary to the historical pattern of the enforcement of the express powers granted to the Congress to leave the enforcement of them to some general short form act, such as is suggested for § 1334 in the present circumstance respecting bankruptcy. There have been five distinct bankruptcy statutes in the history of the United States, each of which specified in what court it would be enforced and described the jurisdiction of that court, or those courts, to act. Never has there been a reliance on such token statutes as §§ 1331 and 1334 which respectively provide as follows:

"§ 1331. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

"§ 1334. The district courts shall have original jurisdiction, exclusive of the courts of the States, of all matters and proceedings in bankruptcy."

§ 1334 will be discussed more fully below. For the moment it will be sufficient to describe how limited it would be in scope even if it were applicable. The key to the present analysis is "all matters and proceedings in bankruptcy." Those words have to be construed as they were used in 1911.

"Proceedings in bankruptcy" was a term of art which applied to internal management of a case, such as allowance or denial of a discharge, adjudication in bankruptcy, and discretionary issues relating to pleadings, notice, intervention, and so forth. These were all questions of bankruptcy law and so these were within the bankruptcy authority of the district court and of the referee. Where an issue arose between the debtor and a third party respecting a "proceeding", that adversarial action was described as a "controversy in a proceeding", or just as a "controversy." The district courts as courts of bankruptcy and the referees had jurisdiction over controversies respecting management problems and also over controversies respecting property of the estate, both of which are bankruptcy questions from which state courts are excluded. These are within the summary jurisdiction of the courts of bankruptcy.

Where a contested action related to the collection of a debt or damages for breach of contract, it usually was a matter of non-bankruptcy law, either state or federal. It did not come within the bankruptcy jurisdiction of the district court as a court of bankruptcy nor of the referee, except in actions by a trustee or receiver under §§ 60, 67, or 70. If it happened to fall within any of the jurisdictions of a district court, *qua* district court, the action could be maintained in either the district court under its plenary jurisdiction, or in a state court. It could not be brought before the referee nor the district court as a court of bankruptcy.

Consequently, even should it be determined that § 1334 has some kind of residual vitality, nevertheless, that would permit only the administration of actual cases and would not permit the district court as a court of bankruptcy to hold hearings on non-bankruptcy matters; the same is true for the bankruptcy court. On non-bankruptcy matters the jurisdiction of the district court would be a non-bankruptcy jurisdiction based upon diversity, admiralty, postal, federal question, or whatever. The point is that even

(a) if § 1334 did provide bankruptcy jurisdiction, and

(b) the basic interim rule were valid,

the authority of the bankruptcy courts under the rule would be very narrowly limited to the administration of cases and controversies concerning property within the possession of the court. The added jurisdiction respecting actions by trustees and receivers under § 23b would be gone as would the "consent" jurisdiction under § 2a(7). About the only adversary proceedings which the bankruptcy courts could hear would be those in which a modification of the automatic stay was sought. The meaningful adversary proceedings to the estate such as recovery of preferences, would have to be brought in state courts or on diversity grounds in the district court, causing the jurisdiction of the bankruptcy courts in practical terms to be about ⅓ of what it was under the Bankruptcy Act.

Even if a court in a subjective decision should hold that under the interim rule the district court has delegated authority to the bankruptcy court, the district court could not delegate any more than it had, which is very little. Similarly, should the district court withdraw a reference under C(2) of the rule, there is almost no space in which the district court can operate if its jurisdictional reliance is upon § 1334.

Many of the subjective opinions state that the Congress carefully preserved § 1334 to take care of just such a contingency as exists today, which is nonsense.[35] There was a sound legislative reason for leaving § 1334 intact, in addition to which there was a practical consideration. The fanciful statements listed in the footnotes add nothing to the jurisprudential reputations of their declarants. Here again, the tenured judges refuse to deal with the facts.

The Bankruptcy Act of 1898 was repealed as of October 1, 1979 by § 401(a) of the Reform Act, with the limitations of § 403(a) that all cases and proceedings filed under that Act should continue to be heard as if the Act had not been repealed. § 1334 was a part of the Judicial Code and stood aloof and apart from the Bankruptcy Act. It never had been considered as having any jurisdictional effect. If it continued in force, the old cases would be administered in the same manner that they always had been in the past. If § 1334 had been re-pealed by the Reform Act, a question would have arisen as to what the effect of the repeal was on the old cases. It would have opened a Pandora's box of jurisdictional contentions. (These always have been the principal deterrent to an efficient and expeditious bankruptcy administration). Leaving § 1334 in place meant that new types of questions would not be raised with respect to old cases.

A practical mechanical reason for leaving § 1334 in place related to the different approaches to jurisdiction which were under way in the two houses of Congress. H.R. 8200 was the House proposal, which contemplated an Article III bankruptcy court based upon § 1471 essentially. S.2266 was the Senate proposal, which contemplated an Article I bankruptcy court based upon an expanded § 1334. To a limited degree correlation between the staffs of the two houses was simplified if the House version did not repeal the foundation stone of the Senate Bill.

Developments in the 1930's are an additional proof that § 1334 did not have the force which is attributed to it currently. There was a desire to enhance bankruptcy powers to provide for greater flexibility for extensions and compositions. The Bankruptcy Act was amended by the addition of § 73 and § 77A,[36] consistent with the historic principle of having jurisdiction and substance within the same bankruptcy stat-

---

35. "Congress carefully left in effect, until 1984, statutory provisions that give the federal district courts 'original jurisdiction, exclusive of the courts of the states, of all matters and proceedings in bankruptcy.' 28 U.S.C. § 1334." In re Northland Point Partners, 26 B.R. 1019, 1021 (D.C.E.D.Mich.1983) (underscoring supplied).

"The fact that the old § 1334 remains in force during the transition period is evidence of a Congressional intention to maintain district court jurisdiction over bankruptcy." Moody v. Martin, 27 B.R. 991 at 997 (D.C.W.D.Wis.1983) (underscoring supplied).

"We do not interpret Congress' failure to repeal the old § 1334 as an oversight ... Congress purposefully chose not to eradicate the original jurisdiction historically residing in the district court. Intending to avoid precisely the situation created by Northern Pipeline, Con-gress left the district courts' jurisdiction over bankruptcy matters intact." White Motor Corporation v. Citibank, N.A., 704 F.2d 254 at 261 (6th Cir.1983).

36. § 73. "Additional jurisdiction. In addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, courts of bankruptcy shall exercise original jurisdiction in proceedings for relief of debtors; as provided in section 74, 75 and 77 of this Act." Act of March 3, 1933, 47 Stat. 1467.
§ 77A. "Additional jurisdiction. In addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt courts of bankruptcy shall exercise original jurisdiction in proceedings for the relief of debtors as provided in section 77B of this Act." Act of June 7, 1934, 48 Stat. 911.

ute. The procedural amendments would not have been necessary if § 1334 had been a bankruptcy force, as contended by the proponents of the interim rule.

It is more likely than not that the issue of retaining § 1334 never was faced squarely. If it had been addressed, it would have been at a time when bankruptcy courts were slated to be Article III courts, more than one year before the last minute change to Article I status. A condition such as exists presently could not have been contemplated as a contingency because there would have been no constitutional problem in having an Article III bankruptcy court deal with Article III issues.

▬ Sticking to the facts and not engaging in self-serving flights of fancy, as many of the subjective opinions do, we find that § 1334 never was relied on to be the basis for bankruptcy jurisdiction.[37] The most concrete method of establishing that point is to look at bankruptcy jurisdiction before the enactment of § 1334 as a part of the Judicial Code in 1911 and then to take a second look after 1911. One will find that the jurisdiction did not change. In the view of all observers bankruptcy jurisdiction was the same before as after § 1334 was adopted. It was an *in rem* jurisdiction, uniformly called "summary jurisdiction", supplemented by an *in personam* jurisdiction over actions by receivers and trustees to recover property under Sections 60, 67 and 70 of the Bankruptcy Act (§ 23b).

This Court is aware of only two treatises or comments which ever suggested that § 1334 provided jurisdiction to bankruptcy courts or district courts as courts of bankruptcy prior to the fall of 1982 when the Administrative Office began to float its theories of continuing jurisdiction for bankruptcy courts.

The legislative history respecting the enactment of § 1334 which is readily available does not reflect any strong reason for its enactment other than the fact that the laws respecting federal jurisdiction were being compiled into a code. Most of the express powers of Congress are given sections in the Judicial Code, even though the bulk of the judicial authority respecting them is in other acts which are primarily substantive, just as bankruptcy law and procedure always had been combined until the adoption of the Bankruptcy Code.

The substance of § 1334 was repealed as of March 31, 1984, and a new appellate process was established commencing April 1, 1984 using the same section number. By cross-reference under the provisions of § 405(c)(2) the new § 1334 became operative during the transition period. A good argument can be made that the old § 1334 was repealed by implication as of October 1, 1979, just as it was expressly as of April 1, 1984, because otherwise there would have been in operation two sections numbered 1334 with different substantive provisions occupying the same section number. The argument, however, conflicts with the more logical proposition that § 1334 was kept in place to avoid jurisdictional confusion in pending Bankruptcy Act cases. For example, if § 1334 had had some jurisdictional significance and was repealed, would the controlling law have been that on the date of the filing of the case, or on the date of the enactment of the repeal, or on the effective date of the repeal, or on the date of discharge, and so forth?[38]

A person who is not familiar with the politics of the courts has no good way of knowing whether the Judicial Conference of the United States, the Administrative Office of the United States, Federal Judges Association, and individual tenured federal

---

**37.** S. 2266 had been drafted to use an augmented § 1334 as the jurisdictional vehicle, but the Senate format never played a prominent part in the legislative process. Various substantive views favored by the Senate became a part of the overall Reform Act, but the framework of H.R. 8200 was accepted by both houses at an early stage.

**38.** If the Senate bill (S. 2266) should have become the dominant bill rather than H.R. 8200, there would have been fewer last minute drafting changes if § 1334 had not been eliminated by H.R. 8200. A base would have existed upon which the jurisdictional aspects of S. 2266 could stand.

judges should be treated as a unit or separately in describing how the present chaos evolved.

The chief judges of the circuits presently are faced with a dilemma. If possible, they probably would like to avoid having to admit having made a mistake. They also may be presumed to be reluctant to crack down in a public way upon the Judicial Conference staff which promoted the rule or the Committee on Bankruptcy Administration which devised the rule, because in doing so there is a tacit admission that the chief judges, being the permanent members and constituting one-half of the Conference have not been supervising the workings of the Conference with sufficient detail and care. Just as it is difficult for a Board of Directors to exculpate itself from staff activities of a corporation, the chief judges face the difficult problem of trying to correct a situation without admitting that anything is wrong.

This opinion has commented throughout on the seeming subjective attitude toward the interim rule of most tenured federal judges, without specifying what they are seeking and why. Their attitudes may vary in kind and in degree but probably they are encompassed within the principles enunciated by Judge Simon Rifkind, formerly judge of the District Court of the Southern District of New York and president of the American College of Trial Lawyers, as the issue of Article III status for bankruptcy judges was being debated in 1978:

1. "... district courts are courts of general jurisdiction, whose judges are required to deal, on a daily basis, with the full range of substantive law ... As long as bankruptcy cases are tried by Federal district judges exercising a general jurisdiction, the winds of change of legal doctrines will be felt in the bankruptcy law to the same degree as in the general body of the law.

2. "If bankruptcy cases are tried in a specialized trial court, they will be insulated from the rest of the law... In addition, a specialized bankruptcy court would have other unfortunate consequences. To some extent, a specialized bankruptcy bar has already begun to develop. If a specialized bankruptcy court, with its own procedures, were established, this specialization would be aggravated.

3. "... a significant increase in the number of Article III judges, contemplated by the proposed law, would dilute the significance, and prestige of district judgeships. Prestige is a very important factor in attracting highly qualified men and women to the federal bench... Creation of a specialized bankruptcy court would lead to wholesale appointment of current bankruptcy referees." Rifkind: 52 Am.Bank L.J. 187, 188, 819, 192 (Spring 1978).

Nominally, at least, the current philosophical basis for the opposition to Article III status by the Judicial Conference, Administrative Office, Department of Justice, Federal Judges Association, American Bar Association and American College of Trial Lawyers is point numbered 1, that there should be maintained the historic traditional principle of a single general jurisdiction trial court. When one removes the red, white and blue bunting, he sees that the district court will not be trying bankruptcy cases under any circumstances. Although red, white and blue are not the customary colors of camouflage, they can be extremely effective in certain arenas.

The only way that the district court is going to try bankruptcy cases is if there is a bankruptcy division set up within the district court, so that sitting district judges can continue as before and new appointees can hear bankruptcy cases. That the single trial court is not in fact the objective of the organizations listed above is demonstrated by the fact that they were as opposed in the fall of 1982 to the idea of a bankruptcy division of the district court as they were to the creation of an independent bankruptcy court.

Normally a majority of the members of any bar association are general practitioners and, reflecting the views of the majority, a bar association will oppose any form of

specialized bar. Presumably that is the basis for the American Bar Association stance.

### Precedents

An individual analysis of the district court and court of appeals cases upholding the validity of the rule will not be made because they have so many common elements. For example, every one of them contains two or more of the following distortions.

1. *§ 105 of the Bankruptcy Code*
 (a) "bankruptcy court" means "district court",
 (b) "order, process, or judgment" means "jurisdiction."
2. *Rule 927 of the Bankruptcy Rules*
 (a) "not inconsistent with these rules" means "inconsistent with these rules",
 (b) "practice and procedure" means "jurisdiction";
3. *Rule 83 of the Federal Rules of Civil Procedure*
 (a) "not inconsistent with these rules" means "inconsistent with these rules",
 (b) "practice" means "jurisdiction";
4. *Rule 53(b) of the Federal Rules of Civil Procedure*
 "A reference to a master shall be the exception and not the rule" means that a standing master may be appointed to hear every case;
5. *§ 2071 of the Judicial Code*
 "conduct of their business" means creating jurisdiction for other courts;
6. *§ 2072 of the Judicial Code*
 "process, writs, pleadings, motions, practice and procedure" means "jurisdiction";
7. *§ 2075 of the Judicial Code*
 "process, writs, pleadings, motions, practice and procedure" means "jurisdiction";
8. *§ 331 of the Judicial Code*
 (a) "management procedures and expeditious conduct of court business" means "jurisdiction";
 (b) "practice and procedure" means "jurisdiction";
 (c) "simplicity in procedure, fairness in administration" means "jurisdiction";
9. *§ 332 of the Judicial Code*
 "expeditious administration of justice" means "jurisdiction"; or
10. *§ 604(a)(3) of the Judicial Code*
 "business of the courts" means "jurisdiction".

One of the most common explanations of the contended validity of the interim rule is to start by stating that a grant of bankruptcy authority to district courts is constitutional, therefore, the rule delegating the authority is valid. The syllogism is incomplete because

(a) there is presently no valid grant of authority to the district courts, and if there were one,

(b) it would have to be exercised by the district courts, or there would have to be a statutory authority for delegation.

Not a single one of the cases upholding the rule looked at the whole of § 241(a) and recognized that more than one-half of the twelve sections constituting it (§§ 1471–1482) contain venue and jurisdiction provisions directed expressly to bankruptcy courts. Even if the argument of the Chief Justice were adopted that only § 1471(c) was held unconstitutional in *Northern Pipeline,* the same internal conflict would exist between § 1471(a) and (b) and §§ 1472–82 as had existed between § 1471(a) and (b) and § 1471(c). There still would be Article I courts exercising power under §§ 1472–82 which had been granted to Article III courts in § 1471(a) and (b).

Many of the decisions take the position that the rule is necessary as policy matter, ignoring the separation of powers doctrine that policy is established by the Congress. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). If there had been no rule in 1982, Congress would have acted. During all of 1983 Congress has been in a position where it could have acted promptly if a vacuum had developed.

Many of the district court decisions state that §§ 404 and 405 were written to take care of the void which might be created in

the event that § 1471 should be held unconstitutional. There is absolutely no truth in that contention; nothing would be served by characterizing the motivational basis for the false statements. § 404 and § 405 were designed to keep the existing bankruptcy court structure intact and to provide a method for concluding cases and proceedings filed under the Bankruptcy Act. They were put in their present form at a time that H.R. 8200 provided for an Article III bankruptcy court, so that there was no need to contemplate a void, because none would arise if an Article III court had all powers.

Two recent decisions will be discussed in detail; *White Motor Corporation v. Citibank, N.A.,* 704 F.2d 254 (6th Cir.1983); and *In re Lear Colorprint,* 29 B.R. 438 (N.D.Ill. 1983). Each of them demonstrates the breadth of the quagmire in which the federal courts currently find themselves.

*White Motor* dealt with two issues, of which one is not present in any of the motions before this court and consequently will be disregarded; that is, whether a district court can appoint a special master. The jurisdictional phase of the decision makes clever use of the big bluff technique of stating that something has been established and then proceeding from that point as though the point has been established. For example, at page 259.

"... it does not necessarily mean that the bankruptcy courts lack a more limited derivative or referred jurisdiction *as a result of delegation by Article III judges acting pursuant to the authority vested in them by Congress.*" (emphasis added).

Congress did not vest in the district courts or circuit councils any authority to delegate, and thus the Sixth Circuit could not cite any authority for that proposition. The statement is the kind of trap for the unwary which is interspersed throughout most of the subjective decisions. Among those who recognize the bootstrap device, its use does not imbue readers with any confidence in the integrity of the court.

The second device which the Sixth Circuit and others have employed rather effectively is the use of a straw man, which is the

constitutionality of a grant of bankruptcy power to district courts. Nobody ever has doubted that such a grant can be made constitutionally, provided that the district courts themselves exercise the power. The Constitutional question is whether the Congress can grant plenary bankruptcy power to the district court to be used by another court. Even if § 1471(a) and (b) should remain intact and should be considered to have survived the collision with *Northern Pipeline,* such a conclusion is not relevant unless joined with a statutory authority to delegate the power if it is not to be used directly by the district court.

On page 261 the opinion states:

"Congress delayed the repeal of § 1334 until the Constitutional question could be settled."

There was no constitutional question at that time of a decision to delay, if there was one, because when the status of § 1334 was set, bankruptcy courts were scheduled to become Article III courts.

The doctrine about revival of a repealed statute by a decision of unconstitutionality of the repealer is not applicable to § 1334 in any event. § 1471 did not replace § 1334; it replaced §§ 2a and 23a of the Bankruptcy Act. If the doctrine is applicable, it would be §§ 2a and 23a that would be brought back under a circumstance where the substantive law and procedural law would not mesh.

On page 261, the court states:

"The district courts have both the authority to adopt the interim rule and the obligation to provide for the continuing orderly conduct of bankruptcy proceedings."

The court does not cite any authority for that proposition because there is none. The statement is not true. The Court also says,

"We hold that the interim rule does not violate federal statutory and constitutional principles..."

Here again the court does not cite any authority, but if it had checked out the

point it would have found the following cases directly to the contrary.[39]

On page 261, the following are not supported by authority, and in fact are not true:

"... the district courts have statutory authorization to adopt the interim rule. The rule was initially promulgated under specific statutory provisions directed to the Judicial Conference and the Judicial Councils of the Circuits."

Not true: *White Motor* speak with forked tongue. In addition, the Sixth Circuit is following the same questionable procedures as the Administrative Office in misquoting its authorities, to wit;

*quotation of Sixth Circuit*

"The Conference ... shall submit suggestions to the various courts in the interest of uniformity and expedition of business"

*actual statute*

"The Conference ... shall also submit suggestions and recommendations to the various Courts to promote *uniformity of management procedures* and the expeditious conduct of court business." (emphasis added).

This Court repeats what it has stated previously. If the rule were valid, there would be no necessity to fabricate authority for it. All that would be necessary is to cite the authority.

§ 332 also is misquoted in *White Motor.* As quoted,

"Each Judicial Council shall make all necessary orders for the effective and expeditious administration of the business of the courts within its circuit. The

district judges shall promptly carry into effect all orders of the judicial council."

The section actually reads,

"(d)(1) Each Judicial Council shall make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit. Each council is authorized to hold hearings, to take sworn testimony, and to issue subpoenas and subpoenas duces tecum. Subpoenas and subpoenas duces tecum shall be issued by the clerk of the court of appeals at the direction of the chief judge or his designee and under the seal of the court, and shall be served in the manner provided in rule 45(c) of the Federal Rules of Civil Procedure for subpoenas and subpoenas duces tecum issued on behalf of the United States or an officer or agency thereof.

(2) All judicial officers and employees of the circuit shall promptly carry into effect all orders of the judicial council."

On page 262, footnote 4 further carries on the inaccuracies. Bankruptcy courts are not defined in § 404(a) of the 1978 act. That section provides in part,

"The courts of bankruptcy, as defined under section 1(10) of the Bankruptcy Act, created under 2a of the Bankruptcy Act... shall continue through March 31, 1984..."

Where it suits the purpose of the proponents of the interim rule, they interchange "courts of bankruptcy" and "bankruptcy court" depending upon whether at that juncture they wish to have the district court exercise a function assigned to the bankruptcy court or vice versa.

On page 262, the court states,

---

**39.** "The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the powers of these departments by the Constitution; and in the rule which recognizes their essential co-equality. The sound application of a principle that makes one master in his own house precludes him from impos-

ing his control in the house of another who is master there. James Wilson, one of the framers of the Constitution and a former justice of this court, said that the independence of each department required that its proceedings "Should be free from the remotest influence, direct or indirect, of either of the other two powers." Andrews, The Works of James Wilson (1896), vol. 1, p. 367. *Humphrey's Executor v. United States,* 295 U.S. 602, 629–30, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935).

"Although the district courts have the authority to adopt rules for the administration of bankruptcy cases which are within their jurisdiction. . ."

No authority is cited because there is none. The statement is not true.

Further on page 263 it is stated,

"The bankruptcy courts have only derivative jurisdiction. They do not operate under an exclusive grant of jurisdiction as in § 1471(c) but rather derive their jurisdiction from the district courts as under the Chandler Act."

This is not true. The bankruptcy courts did not derive their authority from the district courts under the Bankruptcy Act, they derived them from the Congress, *as all courts must:*

"§ 34. The judges of the several courts of bankruptcy shall appoint referees. . ."

"§ 38. Referees are hereby invested . . . with jurisdiction to . . ."

(11 U.S.C. §§ 62 and 66, repealed).

The bulk of the authority was established 40 years before the Chandler Act.

It may be that in the nearly 200 year history of the federal court system there has not been an opinion of a panel of judges which shows such a lack of judicial integrity. The decision quotes the late Edward H. "Bull" Warren, prototype for Professor Kingsfield in "The Paper Chase." In speaking of trial advocacy, the Bull used to tell his classes,

"The only way to be successful is to seem fair, and the only way to seem fair is to be fair."

The same is true of judges. The only way that they can hold the respect of the general public is to seem fair. They cannot reach decisions which are contrary to law and maintain respect. They cannot base their explanations upon matters which are not true and expect that lawyers and laymen will have faith in them in the future. They cannot state that a statute says something different from what it does say and expect that future decisions will be afforded recognition.[40]

*In re Lear Colorprint* is a recent decision of Judge Will of the Northern Illinois District Court. In his letter of transmittal to other judges of the district, Judge Will states, in part,

"bankruptcy judges, as ancillary judges of this Court, like magistrates, have jurisdiction to proceed in related proceedings. . ."

What Judge Will fails to relate is that magistrates are provided for in Chapter 43 of the Judicial Code, §§ 631–639. There is a statutory basis for them; Congress has given them a jurisdiction. There was a similar portion of the Judicial Code earmarked for bankruptcy judges—Chapter 90, §§ 1471–1482, which was § 241(a) of the Reform Act and which *Northern Pipeline* said is invalid because it was inseparably linked to § 1471(c), which was declared unconstitutional. There still exists a statutory basis for the judicial work performed by magistrates; there is none for bankruptcy judges.

Several of the points in the opinion will be discussed, so that the flaws in the reasoning may be brought to the surface. Judge Will indicates that *Northern Pipeline* only held a portion of § 241(a) to be unconstitutional, namely, § 1471(c). From that he concludes that the balance of § 241(a) is valid. Like so many of the other district judges, Judge Will skips a step. The fact that the remainder of § 241(a) may be constitutional does not make it valid statutorily. Justice Rehnquist points out the constitutional part of § 241(a) is inseparable from the unconstitutional and thus it is invalid, although without the close connection, it might have been valid.

---

**40.** I watched the judge's mirror break,
It shattered all about him,
The rule he'd made for pride's own sake,
Caused everyone to doubt him.

Too late he seeks a second chance,
To prove himself a man to trust,
His reputation, at a glance,
Lies on the ground like talcum dust.

Judge Will cites the Chief Justice as stating that a simple solution is available. The Chief Justice is correct that it would be a relatively simple solution for Congress to provide that bankruptcy courts should administer cases and that district courts should administer ancillary common law actions—simple on the drawing board but difficult to effectuate. The district courts just would not handle the ancillary actions. They contend now that they are overworked and need to be relieved of diversity of citizenship jurisdiction (§ 1332). Taking on ancillary actions would increase their caseloads by about 25%. What the Chief Justice and Judge Will overlook is that the simple two-tiered arrangement of which they speak would seriously impede the overall administration of bankruptcy cases. The conclusion of ten years of study ending in 1978 was that a single court was the only way by which efficiency might be achieved.

Judge Will uses the standard description by district judges of the cerebrations of Congress respecting § 1334, to the effect that Congress purposely left it in place until April 1, 1984 to take care of the present situation. This disregards the fact that when the decision, if any, to leave § 1334 in place was made, it was at a time that bankruptcy judges had Article III status under H.R. 8200. Article III bankruptcy judges were to consider Article III issues, so that no constitutional issue would arise. No decisions were made respecting § 1334 in the final breathless days before adjournment, when the status of bankruptcy judges was reduced at the behest of the Chief Justice.

Judge Will suggests that § 1471(a) and (b) remain valid and that *Northern Pipeline* merely eliminated § 1471(c). Assume for the moment that such was the first step and that district courts continued to have bankruptcy power. Under § 1472 a case in which the district court had jurisdiction would be filed in the bankruptcy court of the debtor's residence. Under § 1473 adversary proceedings would be filed in the bankruptcy court where the case was filed, and so forth. Under §§ 1472–1482, which together with § 1471 make up § 241(a), one would still see Article I courts trying Article III issues. §§ 1471–82 are interrelated. If § 1471(c) is unconstitutional, much of §§ 1472–82 also is unconstitutional and for the same reason.

Furthermore, if all that *Northern Pipeline* did was to hold § 1471(c) unconstitutional, leaving § 1471(a) and (b) intact, it would mean that district courts would have jurisdiction over bankruptcy cases under § 1471(a) and over proceedings under § 1471(b), but that bankruptcy courts would continue to have jurisdiction over property of the estate under § 1471(e). The district court and the bankruptcy court would be stumbling over each other continuously, because the property within the control of the bankruptcy court would be the most important element in determining the results of the case.

Finally, the enabling legislation of § 73 and § 77A would not have been necessary to establish jurisdiction relating to rehabilitations if § 1334 had had the broad sweep of authority which proponents of the interim rule like to ascribe to it.[41]

The opinion states

"This Court and the Bankruptcy Judges of this Court are, therefore, obliged to implement and adhere to the General Order as directed by the Judicial Council of the Circuit."

Not so. The authority for Judge Wills assertion is § 332(d)(1) of the Judicial Code which he removes from its context, quoting only

"make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit."

Let us suppose that the Circuit Council should determine that the Speedy Trial Act and increases in criminal case filings had caused the district courts to develop a backlog in the administration of their civil calendars which the bankruptcy judges should relieve by taking on certain classes of criminal cases. Without a Congressional di-

---

41. See note 36, supra.

rection providing statutory authority, this Court would not respect a rule of that nature. This Court feels that its responsibility is to support the whole Constitution and to resist the usurpation of powers by any of the three branches of government.[42]

Whether the Judicial Council order was "necessary" is debatable. Without the interim rule and assurance from the Judicial Conference that legislation was not necessary in 1982, there would have been legislation in 1982. At the present time, Congress could pass legislation within two weeks because the Senate has passed a bill and the House has cleared a jurisdictional bill through its Judiciary Committee. The House bill (H.R. 3) provides for an Article III bankruptcy court and efficient administration. The Senate Bill (S. 1013) provides for an Article I court and a cumbersome procedure. Either one of them produces a statutory grant of jurisdiction. (The probabilities are that the Senate bill will run into the *Northern Pipeline* roadblock if enacted). The point is that absence of jurisdiction is no reason to support an unconstitutional rule—better to wait two weeks and have something upon which everyone can rely.

The opinion sums up,

"we conclude that this Court [the district court]—as the Judicial Council has explicitly recognized—has the power pursuant to 11 U.S.C. § 105(a), to promulgate the General Order..."

Judge Will has been a member of the district court for 22 years and for a number of years was a member of the Commission on the Bankruptcy Laws of the United States. He should know the difference between the district court and the bankruptcy court. He does know how to read. He should be able to look at § 105 and see that it says "The bankruptcy court" and know that it means "the bankruptcy court."

This court has not seen the minutes of the meeting at which the Judicial Council

adopted the interim rule but would be willing to wager something other than money that nobody attending that meeting pointed out to the others that § 105 reads, "The bankruptcy court". The odds are very strong that the Judicial Council swallowed whole the package submitted by the Administrative Office and did not even seek comments from nor criticisms by somebody familiar with bankruptcy law.

Footnote 3 discusses § 105 and also Fed. R.Civ.P. 53, which states expressly,

"(b) A reference to a master shall be the exception and not the rule."

Furthermore, there is no reason that a bankruptcy judge should accept a standing assignment. The concept of footnote 2 is not original with Judge Will but has appeared in several subjective opinions and is poorly conceived. The theory goes that even assuming that from 1911 until 1978 § 1334 was limited to bankruptcy cases and did not provide jurisdiction to hear bankruptcy proceedings, that limitation now has been removed as a result of the repeal of the 1898 Act. In other words, § 1334, without any Congressional action respecting it, is converted from a summary jurisdiction statute to a plenary jurisdiction statute by the repeal of a different summary jurisdiction statute.

Footnote 1 says,

"I find no basis for concluding that the 1978 Act was intended to repeal all bankruptcy jurisdiction in the District Courts between 1978 and April 1, 1984."

The judge should have read § 1471(c),

"The bankruptcy court for the district ... shall exercise all of the jurisdiction conferred by this section on the district courts"

and also § 405(b)

"During the transition period [October 1, 1979—March 31, 1984], the amendments made by sections 241 ... of this Act [Bankruptcy Reform Act of 1978] shall

---

**42.** The Sixth Amendment to the United States Constitution states that "... all ... judicial officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution..."

Found among the papers of Thomas Jefferson was an aphorism attributed to Benjamin Franklin,

"Rebellion against tyranny is obedience to God."

apply to the courts of bankruptcy continued by section 404(a) . . . "

Section 241, of which § 1471(c) is a part, is the section covering jurisdiction and venue in which jurisdiction was granted to the district courts in § 1471(a) and (b) and taken away by (c).

It is correct that this arrangement never was discussed publicly because the public discussion had resulted in a § 1471 consisting of two subsections, both granting jurisdiction directly to the bankruptcy courts. The change came following, and as the result of, a telephone call from the Chief Justice to Senator Thurmond. Any discussions which took place were at closed meetings between Attorney General Bell, presenting the viewpoint of the Chief Justice, and Senators or members of their staffs. The result of their agreement was presented on the consent calendar of both houses and never was debated, nor otherwise discussed publicly.

The following assertion of Judge Will is not true and to that extent creates an appearance of desperation in attempting to establish a point:

" 'The Judicial Council's order was undeniably "necessary . . . for the effective and expeditious administration of justice.' The chaos and hardship to litigants that would have ensued at the expiration of the *Marathon* stay, had there been no uniform procedure for carrying forward the business of federal bankruptcy jurisdiction, are universally acknowledged."

Contrary to Judge Will's contention that the interim rule was "undeniably necessary" and "universally acknowledged" to be such, the fact is that the consensus of informed observers in Washington was that an Article III status for bankruptcy judges would have been enacted into law in 1982 if it had not been for the lobbying by the Judicial Conference and the district court judges with their assurance that a law was not necessary because the interim rule would cause the courts to continue to function. The interim rule became a self-fulfilling prophecy in which the district court judges have a vested interest because of their prior assurances to members of Congress.

Judge Will also states:

"and it further appears that the delegations to Bankruptcy Judges contained in the General Order satisfy the Constitutional concerns expressed the plurality and concurrence in *Marathon*. See 102 S.Ct. at 2875–76; *United States v. Raddatz*, 447 U.S. 667, 682, 685 [100 S.Ct. 2406, 2415, 2417, 65 L.Ed.2d 424] (1980); *Crowell v. Benson*, 285 U.S. 22, 51, 54 [52 S.Ct. 285, 292, 293, 76 L.Ed. 598] (1932)."

Most persons familiar with Judge Will believe that he is astute enough to recognize that both of the cases which he cited relate to the scope and extent of a delegation authorized by Congress. To the degree that there is a delegation under the interim rule, it is by the district courts. It is not a question of how much jurisdiction the district court can delegate; the question is whether it can delegate any jurisdiction whatsoever.

There are a number of excellent analyses of the interim rule, mostly by bankruptcy judges. Comparing their opinions with those of district court judges might cause one to believe that bankruptcy judges are more scholarly than district court judges. Such a broad generalization from such a limited sampling is not warranted, although selective comparisons frequently would produce that conclusion.[43] Probably all that can be said by way of generalization is that the results reinforce a conclusion that has been held for centuries—it is easier to analyze than to synthesize. All that the bankruptcy judges had to do was to assemble the data, arrange it in a logical sequence, and announce the final result. On the contrary, many district judges appear to have manufactured data, or use data fabricated by

---

**43.** Compare *In re Color Craft Press Ltd.* 27 B.R. 392 (Bkrtcy.D. Utah 1983) with *In re Color Craft Press, Ltd.* 27 B.R. 962 (D.C.C.D.Utah 1983) and compare *In re Matlock Trailer Corp.,* 27 B.R. 311 (Bkrtcy.M.D.Tenn.1983) with *In re Matlock Trailer Corp.,* 27 B.R. 318 (D.C.M.D. Tenn.1983).

others, which would have to be made to fit in with their preconceived conclusions. Among other things, this meant:

1. deleting "not inconsistent with these rules" where the interim rule was in fact inconsistent with the Federal Rules of Civil Procedure or the Bankruptcy Rules;

2. saying that "bankruptcy court" means "district court"; and

3. saying that "process, practice and procedure" mean "jurisdiction".

Not only did the district judges distort the clear meaning of words, they had to do it in a manner which would not cause their manipulations to be obvious to the average observer. Their efforts frequently were clumsy and do not inspire confidence.

Public confidence is a perishable commodity which will not stand abrasion successfully. Governance is based upon the consent of the governed. All of the policemen in the world cannot maintain a peaceful society unless a majority of the citizens have confidence in the integrity of their public officials. Whenever a public official misbehaves, he causes an infinitismal erosion in the public confidence of all other public officials and makes their jobs more difficult to perform. The tenured judges have hurt not only themselves but all other judges, and also non-judicial public officers. And to what end?

Many of the district court cases upholding the interim rule speak of the necessity for it, as though that would give to the district courts the power to establish bankruptcy jurisdiction for bankruptcy courts. They do not cite any authority for the proposition because there is none. The contention is contrary to the established structure of the American government and also contrary to historical facts.

■ There have been five American bankruptcy acts which have covered slightly over one-half of the lifetime of the Union —99 years out of 195. Whether there should be in effect at any given time a national bankruptcy law is a matter of policy, within the exclusive domain of Con-gress. Both *Blount v. Rizzi,* 400 U.S. 410, 419, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1971) and *U.S. v. 37 Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1402, 1404, 28 L.Ed.2d 822 (1971) use the same language, "it is for Congress, not this court, to rewrite the statute." If the Supreme Court cannot legislate, certainly the district courts cannot.

"This Court can know nothing of public policy . . . It has no legislative powers. . . It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must in general, be addressed to the legislature." *License Tax Cases,* 5 Wall (72 U.S.) 462, 469, 18 L.Ed. 497 (1866).

"But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981).

■ What the rule does is to provide jurisdiction to bankruptcy courts. The establishment of jurisdiction of lower federal courts is a Congressional prerogative. *Skelly Oil Co. v. Phillips Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), *Lockerty v. Phillips,* 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339 (1943).

## CONCLUSION

■ The course of action for this Court to follow was expressed in *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868).

"Without jurisdiction the Court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle."

■ 1. This Court does not have jurisdiction because the statute granting jurisdiction to it was held unconstitutional in *Northern Pipeline.*

2. The district court does not have jurisdiction because the jurisdiction granted to it under § 1471(a) and (b) was not intended to be exercised by the district court.

3. Even if the district court did have jurisdiction, it could not delegate that jurisdiction to the bankruptcy court in the absence of a statute authorizing such delegation.

All motions to dismiss are granted without prejudice to a refiling of cases and complaints without additional filing fees or costs at such time as there shall be enacted by Congress and signed by the president legislation establishing jurisdiction for bankruptcy courts over bankruptcy cases and proceedings arising in or related to bankruptcy cases. Separate orders will issue with respect to each case and proceeding at issue.

## APPENDIX I

### December 23, 1982

HON. WALTER J. CUMMINGS, Chief Judge

HON. WILBUR F. PELL, JR., Circuit Judge

HON. WILLIAM J. BAUER, Circuit Judge

HON. HARLINGTON WOOD, JR., Circuit Judge

HON. RICHARD D. CUDAHY, Circuit Judge

HON. JESSE E. ESCHBACH, Circuit Judge

HON. RICHARD A. POSNER, Circuit Judge

HON. JOHN L. COFFEY, Circuit Judge

HON. CALE J. HOLDER, District Judge

HON. JOHN W. REYNOLDS, Chief District Judge

HON. JAMES L. FOREMAN, Chief District Judge

HON. BARBARA B. CRABB, Chief District Judge

### ORDER

Acting pursuant to the authority vested in the Judicial Council by 28 U.S.C. § 332(d), the Judicial Council of the Sev-

enth Circuit concludes that the uniform effective and expeditious administration of justice within this circuit requires that a rule substantially similar to the attached be adopted by the district courts of this circuit pursuant to 11 U.S.C. § 105 for the administration of the bankruptcy system.

It is so ordered.

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS

### GENERAL ORDER

By direction of the full Court met in Executive Session on Thursday, 16 December 1982, the following is adopted as a Rule of this Court:

A. RESOLUTION

The purpose of this rule is to supplement existing law and rules in respect to the authority of the bankruptcy judges of this district to act in bankruptcy cases and proceedings until Congress enacts appropriate remedial legislation in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathone Pipe Line Co.*, [——] U.S. [——], 102 S.Ct. 2858 [73 L.Ed.2d 598] (1982), or until March 31, 1984, whichever first occurs.

The judges of the district court find that exceptional circumstances exist. These circumstances include: (1) the unconstitutionality of the grant of power to bankruptcy judges in section 241(a) of Public law 95–598; (2) the clear intent of Congress to refer bankruptcy matters to bankruptcy judges.

Therefore, the orderly conduct of the business of the court requires this referral of bankruptcy cases to the bankruptcy judges.

B. FILING OF BANKRUPTCY PAPERS

The Court of Bankruptcy constituted by § 404 of Public Law 95–598 shall continue to be known as the United States Bankruptcy Court of this district. The Clerk of the Bankruptcy Court is hereby designated to maintain all files in bank-

170

ruptcy cases and adversary proceedings. All papers in cases or proceedings arising under or related to Title 11 shall be filed with the Clerk of the Bankruptcy Court regardless of whether the case or proceeding is before a bankruptcy judge or a judge of the district court, except that a judgment by the district judge shall be filed in accordance with Rule 921 of the Bankruptcy Rules.

## C. REFERENCE TO BANKRUPTCY JUDGES

(1) All cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the bankruptcy judges of this district.

(2) The reference to a bankruptcy judge may be withdrawn by the district court at any time on its own motion or on timely motion by a party. A motion for withdrawal of reference shall not stay any bankruptcy matter pending before a bankruptcy judge unless a specific stay is issued by the district court. If a reference is withdrawn, the district court may retain the entire matter, may refer part of the matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge with instructions specifying the powers and functions that the bankruptcy judge may exercise. Any matter in which the reference is withdrawn shall be reassigned to a district judge in accordance with the court's usual system for assigning civil cases.

(3) Referred cases and proceedings may be transferred in whole or in part between bankruptcy judges within the district without approval of a district judge.

## D. POWERS OF BANKRUPTCY JUDGES

(1) The bankruptcy judges may perform in referred bankruptcy cases and proceedings all acts and duties necessary for the handling of those cases and proceedings except that the bankruptcy judges may not conduct:

(a) a proceeding to enjoin a court;

(b) a proceeding to punish a criminal contempt—

(i) not committed in the bankruptcy judge's actual presence; or

(ii) warranting a punishment of imprisonment;

(c) an appeal from a judgment, order, decree, or decision of a United States bankruptcy judge; or

(d) jury trials.

Those matters which may not be performed by a bankruptcy judge shall be transferred to a district judge.

(2) Except as provided in (D)(3), orders and judgments of bankruptcy judges shall be effective upon entry by the Clerk of the Bankruptcy Court, unless stayed by the bankruptcy judge or a district judge.

(3)(a) Related proceedings are those civil proceedings that, in the absence of a petition in bankruptcy, could have been brought in a district court or a state court. Related proceedings include, but are not limited to, claims brought by the estate against parties who have not filed claims against the estate. Related proceedings do not include: contested and uncontested matters concerning the administration of the estate; allowance of and objection to claims against the estate; counterclaims by the estate in whatever amount against persons filing claims against the estate; orders in respect to obtaining credit; orders to turn over property of the estate; proceedings to set aside preferences and fraudulent conveyances; proceedings in respect to lifting of the automatic stay; proceedings to determine dischargeability of particular debts; proceedings to object to the discharge; proceedings in respect to confirmation of plans; orders approving the sale of property where not arising from proceedings resulting from claims brought by the estate against parties who have not filed claims against the estate; and similar matters. A proceeding is not a related proceeding merely because the outcome will be affected by state law.

(b) In related proceedings the bankruptcy judge may not enter a judgment or dispositive order, but shall submit findings, conclusions, and a proposed judgment or order to the district judge, unless the parties to the proceeding consent to entry of the judgment or order by the bankruptcy judge.

E. DISTRICT COURT REVIEW

(1) A notice of appeal from a final order or judgment or proposed order or judgment of a bankruptcy judge or an application for leave to appeal an interlocutory order of a bankruptcy judge, shall be filed within 10 days of the date of entry of the judgment or order or of the lodgment of the proposed judgment or order. As modified by sections (E)(2)(A) and (B) of this rule, the procedures set forth in Part VIII of the Bankruptcy Rules apply to appeals of bankruptcy judges' judgments and orders and the procedures set forth in Bankruptcy Interim Rule 8004 apply to applications for leave to appeal interlocutory orders of bankruptcy judges. Modification by the district judge or the bankruptcy judge of time for appeal is governed by Rule 802 of the Bankruptcy Rules.

(2)(a) A district judge shall review:

(i) an order or judgment entered under paragraph (D)(2) if a timely notice of appeal has been filed or if a timely application for leave to appeal has been granted;

(ii) an order or judgment entered under paragraph (D)(2) if the bankruptcy judge certifies that circumstances require that the order or judgment be approved by a district judge, whether or not the matter was controverted before the bankruptcy judge or any notice of appeal or application for leave to appeal was filed; and

(iii) a proposed order or judgment lodged under paragraph (D)(3), whether or not any notice of appeal or application for leave to appeal has been filed.

(b) In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.

(3) When the bankruptcy judge certifies that circumstances require immediate review by a district judge of any matter subject to review under paragraph (E)(2), the district judge shall review the matter and enter an order or judgment as soon as possible.

(4) It shall be the burden of the parties to raise the issue of whether any proceeding is a related proceeding prior to the time of the entry of the order or judgment of the district judge after review.

F. LOCAL RULES

In proceedings before a bankruptcy judge, the local rules of the bankruptcy court shall apply. In proceedings before a judge of the district court, the local rules of the district court shall apply.

G. BANKRUPTCY RULES AND TITLE IV OF PUBLIC LAW 95–598

Courts of bankruptcy and procedure in bankruptcy shall continue to be governed by Title IV of Public Law 95–598 as amended and by the bankruptcy rules prescribed by the Supreme Court of the United States pursuant to 28 U.S.C. § 2075 and limited by SEC. 405(d) of the Act, to the extent that such Title and Rules are not inconsistent with the holding of *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* [——] U.S. [——], 102 S.Ct. 2858 [73 L.Ed.2d 598] (1982).

H. EFFECTIVE DATE AND PENDING CASES

This rule shall become effective December 25, 1982, and shall apply to all bankruptcy cases and proceedings not governed by the Bankruptcy Act of 1898 as amended, and filed on or after October 1, 1979. Any bankruptcy matters pending

before a bankruptcy judge on December 25, 1982 shall be deemed referred to that judge.

ENTER:
FOR THE COURT
/s/ Frank J. McGarr
Chief Judge

Dated at Chicago, Illinois, this 20th day of December 1982.

## APPENDIX IIA

### ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

December 3, 1982

MEMORANDUM TO ALL: Judges, U. S. Courts of Appeals
Judges, U. S. District Courts
Judges, U. S. Bankruptcy Courts
Clerks, U. S. District Courts
Clerks, U. S. Bankruptcy Courts

SUBJECT: Continued Operation of the Bankruptcy Court System after December 24, 1982, in the Absence of Congressional Action

On September 27, 1982, I transmitted by memorandum a model rule and sample order in accordance with the following September 23, 1982 Resolution of the Judicial Conference:

RESOLVED:

That the Conference request the Director to provide each circuit with a proposed rule to take effect October 5, 1982 in the absence of congressional action or extension of the stay, which rule will permit the bankruptcy system to continue without disruption in reliance upon jurisdictional grants remaining in the law as limited by *Northern Pipeline Construction Co. v. Marathon Pipe Line Co. et al.*

My September 27, 1982 transmission was, of course, designed to provide a "contingency approach," as specified in the Conference's Resolution, "in the absence of Congressional action or extension of the stay," *then* scheduled to expire on October 4. As you know, the Supreme Court, on October 4 extended the stay until December 24, because Congress was not able to act before recessing on October 2.

Congress reconvened on November 29, five days ago. While efforts to take action are now being made by the Congress, I believe prudence requires that I again pro-

vide "a proposed rule ... which ... will permit the bankruptcy system to continue without disruption" should Congress be unable to act—or if the stay is not again extended—by December 24.

In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co., et al.*, [—— U.S. ——] 102 S.Ct. 2858 [73 L.Ed.2d 598] (1982) the Supreme Court found that certain powers assigned to bankruptcy judges by the 1978 Bankruptcy Reform Act could be exercised constitutionally only by Article III judges, that language in the Act conferring unconstitutional authority could not be severed from language conferring other powers, and therefore provided the opportunity for Congress to correct the jurisdictional problem.

The Conference on September 10, 1982, advised Congress of its belief that the Supreme Court decision did not completely invalidate subsections (a) and (b) of section 1471 of Title 28, United States Code, as enacted in section 241(a) of the 1978 Act. In addition, sections 404 and 405 of that Act expressly vest bankruptcy powers in the *district* courts as "courts of bankruptcy" *until April 1, 1984.* The attached model rule has been formulated in reliance upon the remaining valid elements in the 1978 Act.

The attached model rule is intended to be an interim measure, by which district courts may delegate many of their bankruptcy powers to bankruptcy judges. The authority for that delegation is found in section 105 of the 1978 Act, which gives courts of bankruptcy the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," and in Bankruptcy Rule 927, which gives bankruptcy courts the power to adopt "rules governing practice and procedure under the Act."

Under the model rule, all bankruptcy matters are initially referred to a bankruptcy judge. [Section b(1) of the Rule.] In proceedings not involving a final judgment on a *Marathon* claim, the bankruptcy judge may enter orders and judgments that become effective immediately, subject to district court review if requested by a party.

[Section (c)(2).] With respect to final judgments in *Marathon* claims, the bankruptcy judge prepares recommended findings and conclusions and a proposed judgment. [Section (c)(3).] A district judge then reviews the recommendation and enters a judgment. [Section (c)(5).] Where the bankruptcy judge certifies that circumstances require, an order or judgment entered by a bankruptcy judge will be confirmed by a district judge even if no objection is filed.

The district court will provide expedited review or confirmation of any order, judgment, or proposed judgment where the bankruptcy judge certifies prompt review is necessary.

/s/ William E. Foley

William E. Foley

Attachments:

Model Rule

Sample Order

## APPENDIX II-B

### FEDERAL JUDGES ASSOCIATION

January 14, 1983

TO: ALL MEMBERS OF THE FEDERAL JUDGES ASSOCIATION
and
OTHER INTERESTED FEDERAL JUDGES

FROM: Judge Spencer Williams, President

SUBJECT: A legislative solution to the bankruptcy problem

Request: Talk to your members of Congress during this legislative recess

1. <u>FJA SUPPORTS JUDICIAL CONFERENCE OF UNITED STATES:</u> In our last general mailing (October 18) we indicated that the board of directors of FJA had endorsed the Judicial Conference of the United States (Judicial Conference) position on the solution to the problems raised by *Marathon Pipe Line* and asked you to mention it to your friends in Congress. Since then, and particularly during the Special Session your board of directors and many other FJA members have been in contact with members of Congress, urging their support of this position. Since that session ended without passage of any remedial legislation, it is important that we continue, renew and expand our efforts. THERE IS EVERY INDICATION THAT MATTER WILL BE HIGH ON THE AGENDA FOR THE NEW CONGRESS[1], AND IT IS THUS IMPERATIVE WE EACH DO OUR PART . . . NOW.

2. <u>THE REQUEST:</u> Congress will be in recess until January 25. This means that many members will spend at least part of this time in their home district making

---

1. HR # 3 (Rodino & Fish) was introduced on January 3. It provides for 127 Article III Bankruptcy Judges on annual salaries of $67,000.

them more accessible to each of us. PLEASE CONTACT THEM THIS WEEK (if you can do so comfortably) AND DO TWO THINGS:

A.) Thank them for the 4% salary increase. This *may* be the first step in the reduction of tensions between Congress and the Judiciary, and we should express our appreciation.

B.) Tell them that the FJA—and *most* Federal judges—support the position taken by the Judicial Conference and the Chief Justice, (for the reasons set forth below), and ask them to contact you if, in the future, they have any questions or would like any further documentation.

3. THE PROBLEM ... AND THE SO-LUTIONS MOST FREQUENTLY DIS-CUSSED: (The following is an oversimplification, but should suffice pending receipt of a detailed package of material from Bill Weller later this month):

MARATHON PIPE LINE declared the Bankruptcy Reform Act of 1978 unconstitutional because it delegated to the bankruptcy judges jurisdiction over matters that should only be heard by Article III judges. The effective date of this decision was postponed until October 4 to give Congress time to act, and was extended to December 24. A subsequent request for a further extension was denied.

A number of bills were introduced to solve the problem. They run the gamut from the Rodino approach to the one supported by the Judicial Conference of the United States. Under Rodino all bankruptcy judges positions would be converted into modified Article III positions, with the incumbents being blanketed in until the President could fill the positions through standard Article III procedures. Under the Judicial Conference, the bankruptcy procedures would be fully integrated into the present Article III structure with all bankruptcy matters being filed in Federal District Court. Non-contested matters (over

**2.** Carried logically to its ultimate absurdity, why not create specialist Supreme Courts? Or

60% of the current bankruptcy cases) would be handled by a non-judicial bankruptcy administrator, traditional bankruptcy contested matters (e.g., those contested matters that arose under the former bankruptcy act) would be handled by the magistrates, and Article III matters (those found in *Marathon* to be unconstitutionally delegated to the bankruptcy judges) would be assigned to United States District judges as are, any *other* federal cases over which they have jurisdiction.

Another plan was to appoint a number of Article III judges with a bankruptcy specialist "designation," and provide that they handle regular Article III matters if and when they were not otherwise busy on bankruptcy litigation.

Many arguments for and against these approaches bounced around. Some were political, some conceptual, some practical and some impractical. A few are repeated here without evaluation, and without indicating the actual or purported source.

*For the Rodino Approach:* It is a simple solution to a difficult problem. It gives the President 227 new Article III appointments (staggered over three years).

*Against the Rodino Approach:* It could be the first step in the fragmentation of the Federal Judiciary (if Article III Bankruptcy Specialists, why not Article III Tax Specialists, Article III Patent and Copyright Specialists? Article III Civil Rights Specialists? and the like?)[2] ... it gives priority to Bankruptcy-related Article III matters over all other Article III matters ... it is overkill to process all bankruptcy matters through Article III judges, even modified Article III judges ... it gives the President too many Article III appointments.

*For the Judicial Conference approach:* It is a good, clean, sensible solution the problem ... it is less expensive (by $40 million) than the Rodino approach ... it prevents fragmentation of the Federal Judiciary ... it would carry a fee structure lower than Rodino giving a break to bankruptcy petitioners.

designate specialist categories for three or four of the United States Supreme Court justices?

*Against the Judicial Conference approach:* There is no need to scrap the present system ... it does not provide enough Article III appointments for the President ... Article III judges do not want to handle bankruptcy matters.

4. THE BASIS OF FJA SUPPORT OF THE JUDICIAL CONFERENCE:
THE BOARD OF DIRECTORS OF FJA BELIEVES THAT ANYTHING THAT WOULD TEND TO FRAGMENT THE FEDERAL JUDICIARY WOULD BE ADVERSE TO THE MAINTENANCE OF THE STRONG, VIABLE, GENERALIST ARTICLE III JUDICIAL SYSTEM THAT HAS BEEN THIS NATION'S HISTORY SINCE ITS EARLIEST DAYS. IT IS THIS GENERALIST APPROACH THAT HAS ENABLED THE FEDERAL JUDICIARY TO BECOME ONE OF THE MOST, IF NOT *THE* MOST EFFECTIVE JUDICIAL SYSTEM IN THE WORLD.

In response to other comments about the basis for FJA's position: *Article III judges are not reluctant* to handle bankruptcy cases, and will handle them in the same, expeditious, conscientious manner in which they handle all other new matters that Congress from time to time adds to their judicial responsibilities.

*Article III judges are not merely protecting turf* by keeping the number of Article III positions to a minimum in order to prevent dilution of their 'status'. We welcome new positions whenever they are required to handle the additional workload arising from this, or any other added jurisdictional responsibility given us by Congress. Every year the new judicial statistics show heavier case loads and higher dispositions rates due, in large part, to new responsibilities placed upon us by Congress. We seldom resist new judgeships, in fact generally try hard to get them. Our position, plain and simple, is that this first step in fragmentation would have serious long-range effects on the Federal Judiciary, and that it is unwarranted particularly in view of the availability of a better solution.

*CAVEAT:* WE DO NOT MALIGN, OR CRITICIZE OTHER PRACTICAL OR POLITICAL CONSIDERATIONS HELD BY THOSE VESTED WITH THE POWER AND RESPONSIBILITY TO SOLVE THIS PROBLEM. WE HOPE, HOWEVER, THESE CONSIDERATIONS CAN BE ACCOMMODATED WITHOUT INFLICTING THE SERIOUS DAMAGE TO THE FEDERAL JUDICIAL SYSTEM WHICH WE FORESEE.

5. SPECIAL NOTE TO FJA MEMBERS: We have prepared, and will soon mail an update on our activities during the judicial salary considerations, our plans for supporting Judicial Survivors Annuity System (JSAS) legislation during the 98th Congress, other legislative matters we are following, and plans for a meeting in Washington during the Spring of 1983.

INCLUDED FOR YOUR INFORMATION IS A LIST OF THE MEMBERSHIP OF THE HOUSE AND SENATE JUDICIARY AND APPROPRIATIONS COMMITTEES. WHILE EVERY VOTE COUNTS, THESE ARE THE KEY PERSONS WITH WHOM WE MUST DEAL ON ANY LEGISLATION AFFECTING THE JUDICIARY.

MEMBERS OF SENATE JUDICIARY COMMITTEE

Judiciary

(Suite 2226, phone 45223, meets at the call of the chairman)

| | |
|---|---|
| Strom Thurmond, of South Carolina. | Joseph R. Biden, Jr., of Delaware. |
| Charles McC. Mathias, Jr., of Maryland. | Edward M. Kennedy, of Massachusetts. |
| Paul Laxalt, of Nevada. | Robert C. Byrd, of West Virginia. |
| Orrin G. Hatch, of Utah. | Howard M. Metzenbaum, of Ohio. |
| Robert Dole, of Kansas. | Dennis DeConcini, of Arizona. |
| Alan K. Simpson, of Wyoming. | Patrick J. Leahy, of Vermont. |
| John P. East, of North Carolina. | Max Baucus, of Montana. |
| Charles E. Grassley, of Iowa. | Howell Heflin, of Alabama. |
| Jeremiah Denton, of Alabama. | |
| Arlen Specter, of Pennsylvania. | |

◼◼◼◼◼◼◼◼◼◼◼◼

◼◼◼◼◼◼◼◼◼

## MEMBERS OF HOUSE JUDICIARY COMMITTEE

Committee on Judiciary: Peter W. Rodino, Jr., New Jersey (chairman); Jack Brooks, Texas; Robert W. Kastenmeier, Wisconsin; Don Edwards, California; John Conyers, Jr., Michigan; John F. Seiberling, Ohio; Romano L. Mazzoli, Kentucky; William J. Hughes, New Jersey; Sam B. Hall, Jr., Texas; Mike Synar, Oklahoma; Patricia Schroeder, Colorado; Dan Glickman, Kansas; Harold Washington, Illinois; Barney Frank, Massachusetts; Geo. W. Crockett, Jr., Michigan; Charles E. Schumer, New York; Bruce A. Morrison, Connecticut; Edward F. Feighan, Ohio; Lawrence J. Smith, Florida; and Howard L. Berman, California.

Committee on the Judiciary: Hamilton Fish, Jr., New York; Carlos J. Moorhead, California; Henry J. Hyde, Illinois; Thomas N. Kindness, Ohio; Harold S. Sawyer, Michigan; Dan Lungren, California; F. James Sensenbrenner, Jr., Wisconsin; Bill McCollum, Florida; E. Clay Shaw, Jr., Florida; George W. Gekas, Pennsylvania; and Michael DeWine, Ohio.

(List of Appropriation Committee members omitted).

---

## APPENDIX IIC

## UNITED STATES COURT OF APPEALS

SECOND CIRCUIT

July 26, 1982

TO: All Federal Judges

FROM: Committee on the Judicial Branch

As I indicated in my last communication, we have made significant strides on matters of importance to all federal judges. Now that the Committee has completed its summer meeting, I am pleased to report the following:

. . . . .

Finally, the Committee was of the view that the Supreme Court's recent decision in *Northern Pipeline Co. v. Marathon Pipe Line*, [——] U.S. [——] [102 S.Ct. 2858, 73 L.Ed.2d 598] (June 18, 1982), creates significant problems involving the future of bankruptcy judges. It was suggested that Congress might elect to deem bankruptcy judges as Article III judges. Because of our firm commitment that such a step would be counterproductive, costly, and might undermine the independence of the present Article III judiciary, the Committee on the Judicial Branch, in conjunction with the Committees on Court Administration and Bankruptcy, is urging the United

States Judicial Conference to adopt a resolution firmly opposing that part of H.R. 6109 which provides that bankruptcy judges would be appointed pursuant to Article III. (underscoring supplied).

Our efforts on behalf of our colleagues continue undaunted.

Honorable Irving R. Kaufman, Chairman
Honorable Arlin M. Adams
Leonard Garment, Esquire
Honorable Oren Harris
Honorable James Harvey
Honorable Irving Hill
Honorable Abner J. Mikva
William H. Mulligan, Esquire
Honorable J. Clifford Wallace

## APPENDIX IID

U.S. House of Representatives

Committee on the Judiciary

March 7, 1983

Mr. William E. Foley
Director
Administrative Office of
 the United States Courts
Washington, D.C. 20544
Dear Mr. Foley:

I am deeply concerned because we find upon review that the Judicial Conference's cost estimates for H.R. 3 (the Bankruptcy Court Act of 1983) submitted to the Judiciary Committee on February 21, 1983, are patently erroneous and totally unrelated to the legislation.

The cost estimates are based on increased expenditures for facilities, furniture and furnishings, and additional personnel, which are not required by H.R. 3. Specifically, the Judicial Conference's cost figures on H.R. 3 include the cost of additional law clerks and other support personnel, additional rental of space, tenant alterations, additional furniture and furnishings, and additional staff for the Administrative Office of the United States Courts. None of these items, however, are contained in or required by H.R. 3.

Incredibly, Table 3 of the Judicial Conference's February 21 cost estimates on H.R. 3 includes the cost of creating 304 bankruptcy judges, although the legislation specifically authorizes only 227 bankruptcy judgeships. Table 3 also states that 40 bankruptcy judges will be eligible for senior status and contains a $5.48 million first-year-after-enactment cost for "providing senior status for bankruptcy judges." This is completely incorrect. No bankruptcy judge will be eligible for senior status until he has served on the Article III court for at least 10 years (and reached the age of 70). Therefore, the earliest date that any bankruptcy judge would become eligible for senior status under H.R. 3 would be in 1994.

All currently sitting bankruptcy judges have courtrooms, furnishings, clerks' office, and staffs. Hence, these costs are already being incurred, and passage of H.R. 3 will not change them. Bankruptcy judges can continue to use their present facilities. In fact, some cost savings should be realized under H.R. 3 by the abolition of 14 part-time judgeships whose facilities will be no longer required. Nothing in H.R. 3 authorizes additional courtroom facilities or additional law clerks.

H.R. 3 simply leaves the present separate bankruptcy court in place and converts the existing 241 bankruptcy judge positions to 227 tenured positions, in order to comply with the requirements of Article III of the Constitution. Nothing in Article III, in the *Northern Pipeline* decision, or in the bill mandates anything further. No additional law clerks, two-story courtrooms, or other facilities are required. In fact, the *Northern Pipeline* decision expressly points out the contrary with respect to the requirements of Article III—so long as tenure during good behavior is provided and the level of salary is not diminished while a judge is in office, great flexibility exists with regard to all other matters.

The Congressional Budget Office, after their own independent review of the Administrative Office estimates and the legislation, estimates that the fiscal year 1983 cost impact of H.R. 3 would be approximately $.5 million. The fiscal year 1984 cost impact is estimated by CBO as approximately $3 million.

I am disturbed by the enormous disparity between the CBO estimate, our own estimate, and that put forth by the Administrative Office. I suppose I would be less disturbed except for the vigorous manner in which the Administrative Office budget estimates are being pushed as an argument in opposition to the passage of this legislation and I would be less disturbed if the cost estimates set forth in your February 21 material bore some relation to the facts or the bill.

Sincerely,
/s/Peter W. Rodino
PETER W. RODINO, JR.
Chairman

APPENDIX III

United States District Court

For the Eastern District of Michigan

January 7, 1983

Chief Judges of United States
 District Courts

Re: Bankruptcy Emergency Rule

Dear Chief Judge:

Judge Robert E. DeMascio of our Court, who is Chairman of the Judicial Conference Committee on Bankruptcy Administration, entered the enclosed Order today upholding the constitutionality of the Bankruptcy Emergency Rule. This might be helpful to you in your District. When Judge DeMascio's final Opinion is issued, we will send you a copy of that.

Very truly yours,
/s/
John Feikens
Chief Judge

APPENDIX IV

During the thirty-nine months that the Reform Act was effective, ending December 31, 1982, there were 29 appeals to the District Court of the Northern District of Illinois which were not disposed of within a year of perfection of the appeal, spread among twelve judges.

| Judge | Months | Disposition |
|-------|--------|-------------|
| A | 30.25 | decided |
| A | 20 | decided |
| A | 17 | pending |
| A | 13.50 | pending |
| A | 13.50 | decided |
| A | 13.25 | decided |
| B | 20.75 | decided |
| B | 16.50 | decided |
| B | 14 | decided |
| B | 12.50 | decided |
| B | 12.50 | pending |
| C | 17 | decided |
| C | 15.50 | decided |
| C | 13.50 | decided |
| C | 12 | decided |
| D | 15 | decided |
| D | 12.50 | decided |
| D | 12.50 | decided |
| E | 13 | decided |
| E | 12.75 | pending |
| F | 12.50 | decided |
| F | 12 | pending |
| G | 33 | pending |
| G | 20 | pending |
| H | 26.75 | pending |
| I | 26 | decided |
| J | 19 | decided |
| K | 12.50 | pending |
| L | 13 | pending |